416 So.2d 624 (1982)
James ROGERS, Plaintiff-Appellant,
v.
Douglas BROWN, M. D. et al., Defendants-Appellees.
No. 14901.
Court of Appeal of Louisiana, Second Circuit.
June 15, 1982.
Rehearing Denied July 23, 1982.
*625 Paul Henry Kidd, Monroe, for plaintiff-appellant.
Hayes, Harkey, Smith & Cascio by Haynes L. Harkey, Jr. and Thomas M. Hayes, III, Monroe, for defendants-appellees.
Before HALL, JASPER E. JONES and FRED W. JONES, Jr., JJ.
FRED W. JONES, Jr., Judge.
Pursuant to a jury verdict, judgment was rendered rejecting plaintiff's claim for damages based upon alleged medical malpractice against an orthopedic surgeon, his employer medical corporation, and their malpractice insurer. Plaintiff appeals the judgment, posing the following substantial issues:
(1) Did the trial judge commit reversible error in refusing to charge the jury on the doctrine of "untoward event" and the doctrine of res ipsa loquitur?
(2) Was the defendant orthopedic surgeon negligent in his medical treatment of plaintiff?
(3) Did the defendant orthopedic surgeon operate without first obtaining plaintiff's informed consent to the surgical procedure?
*626 For the reasons hereinafter set forth, we affirm the judgment of the district court.
Factual Context
In August 1977, the plaintiff, James Rogers, 42 year old tractor mechanic, fell from a tractor and injured his left knee. During the second week in September 1977, plaintiff consulted his family physician, Dr. George Edwards, Delhi general practitioner, complaining of pain in the injured knee. Diagnosing the ailment as a possible torn ligament, Dr. Edwards referred plaintiff to Dr. Alfons Altenberg, a Monroe orthopedic surgeon, who had performed orthopedic surgery upon plaintiff several years prior thereto.
Dr. Altenberg saw plaintiff on September 23, 1977 and, after an examination, concluded that he was suffering from a sprain of the medial collateral ligament and injected the left knee with hydrocortisone. Dr. Altenberg saw plaintiff again on October 11, 1977 and recommended that he try an anti-inflammatory medicine for relief of the discomfort in his knee. Plaintiff returned to Dr. Altenberg on October 31, 1977, still complaining of persistent pain in the left knee. Dr. Altenberg again gave him an injection of hydrocortisone in the affected knee.
During the time he was undergoing the specialized treatment by Dr. Altenberg, plaintiff remained under the general care of Dr. Edwards, returning to his family physician for treatment on several occasions in September, October and November, 1977. Finally, after seeing plaintiff on December 9, 1977, and learning that Dr. Altenberg's ministrations did not appear to be alleviating his complaints with reference to the injured knee, Dr. Edwards decided that a second orthopedic opinion would be advisable. Consequently, he arranged for plaintiff to be examined by the defendant physician, Dr. Douglas Brown, a Monroe orthopedic surgeon, employed by the medical corporation, Drs. Cannon, Ledbetter, Cline and Bailey.
Dr. Brown first saw plaintiff on January 24, 1978. After taking a history and learning of plaintiff's treatment by Drs. Edwards and Altenberg, Dr. Brown examined plaintiff, noting in the muscle behind the left knee a fullness which indicated the possible presence of a mass or cyst. Dr. Brown concluded that the latter might be irritating the nerve in that area of the left knee.
Plaintiff communicated to Dr. Brown a sense of urgency about resolving his knee problem, stating that it was substantially interfering with his ability to work. In view of this, Dr. Brown scheduled special orthopedic tests for the following day. After their completion, results of the tests were found to be within a normal range. An orthogram revealed no abnormality in the knee joint and the nerve conduction test result proved to be at the lower end of normal range.
After reviewing the test results on January 25, 1978, Dr. Brown continued in his conviction that something was pressing on the peroneal nerve lying behind plaintiff's left knee. The doctor theorized that there might be some kind of growth or mass in the muscle behind that particular nerve. Consequently, after discussing these possibilities with plaintiff, Dr. Brown scheduled surgery to explore the peroneal nerve and tendon running alongside it for February 2, 1978 at Glenwood Hospital in West Monroe.
During the course of that surgical procedure, Dr. Brown found a tight band of tissue overlying the peroneal nerve and observed that the nerve was flattened in the affected area. He then examined the muscle lying in back of the left knee but found no mass, cyst or tumor impinging on the peroneal nerve. Concluding that plaintiff's problem was due to compression of the peroneal nerve by the band of tissue, Dr. Brown performed an internal neurolysis. This consisted of puncturing the outer coating of the peroneal nerve with a small syringe needle and slowly injecting a saline solution into the nerve to break up any tissue inside it and restore the nerve to its normal shape. The operation was completed by washing out the wound with an antibiotic solution and closing it up.
*627 During the postoperative recovery, plaintiff discovered that he was unable to lift his left foot. Dr. Brown initially attributed this "drop foot" to a temporary paralysis of the peroneal nerve, a not uncommon occurrence following surgery of this nature. However, when the nerve palsy and "drop foot" continued through May 1978, Dr. Brown referred plaintiff for examination to Dr. David Kline, New Orleans neurosurgeon and head of the Department of Neurosurgery at L.S.U. Medical School in New Orleans.
Dr. Kline first saw plaintiff on July 18, 1978. After a physical examination and review of tests, Dr. Kline concluded that plaintiff was suffering from a complete peroneal nerve palsy, causing the "drop foot". He recommended an operation for the purpose of examining the affected nerve and, possibly, for performing a nerve graft.
Dr. Kline operated on plaintiff on August 17, 1978. He found that the peroneal nerve in the left knee area was in continuity (not severed) and, although injured, was in the process of regenerating itself. He noted the presence of some scar tissue around the nerve. Determining that a graft was unnecessary because "Mother Nature was doing its job," Dr. Kline simply manipulated and freed up the peroneal nerve.
After his release from the hospital, plaintiff was seen by Dr. Kline from time to time until December 1980. He observed that plaintiff was experiencing gradual improvement and, on the occasion of his last examination, that plaintiff's left knee had returned to 60% of normal.
Res Ipsa Loquitur
Plaintiff argues that the trial judge committed reversible error in refusing to charge the jury that his proof of the occurrence of an "untoward event" (peroneal nerve palsy resulting in "drop foot") during the operation by Dr. Brown created a presumption of negligence which defendants were obligated to rebut. He further contends that, since the circumstantial evidence suggested the negligence of Dr. Brown as the most plausible explanation of the peroneal nerve damage, the trial judge also erred in refusing to charge the jury as to the doctrine of res ipsa loquitur.
Although the court in Gage v. St. Paul Fire & Marine Ins. Co., 282 So.2d 147 (La. App.1973) purported to draw a distinction between the doctrine of "untoward event" and that of res ipsa loquitur,[1] we can discern no practical difference between the two and conclude that the former falls under the rubric of the latter. Therefore, our discussion of this issue deals with the applicability of res ipsa loquitur.
La.R.S. 9:2794(A)[2] prescribes the burden of proof which must be discharged by a plaintiff in a malpractice action based on the alleged negligence of a physician. However, Section C of the statute provides:

*628 "In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician or dentist. The jury shall be further instructed that injury alone does not raise a presumption of the physician's or dentist's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable." (Emphasis added)
The critical question here is whether the trial judge should have found the doctrine of res ipsa loquitur applicable and so instructed the jury.
The doctrine of res ipsa loquitur becomes applicable when the circumstances surrounding the incident in question (here the operation and resulting nerve impairment) are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the injury was due to the negligence of the person (here the orthopedic surgeon performing the operation) having control of the thing involved in the injury. In essence, this inference of negligence may be drawn because all of the circumstances surrounding the injury are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the injury was due to some breach of the defendant's (physician's) duty. See Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389 (1957); White v. McCool, 395 So.2d 774 (La.1981).
In reality, the doctrine of res ipsa loquitur is simply another formulation of plaintiff's burden in a tort action to prove that, more probably than not, his injury was caused by defendant's negligence. However, before charging the jury on the propriety of drawing this inference of negligence from the circumstances, it is the function of the trial judge in a medical malpractice case to decide the applicability of the doctrine by addressing these threshold questions: (1) Did the injury occur while plaintiff's body was in the exclusive custody of the defendant physician and (2) was the injury one that does not ordinarily occur in the absence of negligence, i.e., in this case was Dr. Brown's negligence the most plausible explanation of plaintiff's peroneal nerve damage?
Since the answer to (1) was obviously in the affirmative, we assume that the trial judge refused to instruct the jury on the doctrine of res ipsa loquitur because he answered (2) in the negative. We find that the record amply supports this determination. It was generally agreed by the medical witnesses that Dr. Brown's manipulation during the operation of the previously injured peroneal nerve probably contributed to the nerve paralysis and resulting "drop foot." However, as pointed out by Dr. Kline, it would have been impossible for Dr. Brown to perform an operation of this nature without manipulating the peroneal nerve to free it up. In fact, Dr. Kline manipulated that nerve during the course of his operation. He found no evidence that Dr. Brown had severed the nerve.
Dr. George Wharton, orthopedic surgeon practicing in Dallas, Texas, asked what might cause a peroneal nerve paralysis in a carefully conducted operation, replied: "The possibility of interruption of blood supply is the most likely direct cause." He further explained:
"From the standpoint of why some patient might rarely, but occasionally, get into trouble after having had their nerve dissected up, it is my opinionthe explanation of that would be that some of these small vessels were already blocked off by arteriosclerotic disease, by a previous injury which had caused a really severe stretch in that area or by some other kind of a problem which we don't really have any way to predict or to diagnose in advance. As a result, when these several segments in the center, and no one can clearly give you an estimationthere might be a hundred segments in a hundred little tiny blood vessels in a three inch segment, but when some of these little segments in the middle were disrupted there just happen to be enough *629 blockage from, as I say, hypertensive arteriosclerotic disease or some other process to have blocked this enough to where it was impossible for the blood supply to keep on giving the nutrition necessary for that nerve to function."
Asked to explain the nerve paralysis, Dr. Altenberg postulated:
"... the possibilities are (1) that you have a very hypersensitive nerve, one that has had a circulatory nerve embarrassment of some unknown cause so that any minimal trauma or injury such as an operation might be just enough to tip the balance where the nerve would not function for a while.
"The operation itself assumes a certain amount of manipulation. So you cannot operate on the tissue without manipulating it and if you manipulate it, that might be just enough to make a functional nerve not function."
The record is devoid of any evidence that, based upon the circumstances of the operation in question and the nerve palsy which resulted, the negligence of Dr. Brown was the most plausible explanation for the nerve damage. As noted, all pertinent evidence was to the contrary. Consequently, we do not find that the trial judge erred in refusing to give the requested jury instructions. However, as explained hereinafter, even if the trial judge erred in this respect, it did not constitute reversible error.
Alleged Negligence of Dr. Brown
Plaintiff contends that Dr. Brown was negligent in (1) rushing him into surgery without first employing conservative treatment and (2) in manipulating the peroneal nerve (through internal neurolysis) during surgery.
As we have previously explained, in this medical malpractice action the pertinent statute places upon plaintiff the burden of proving the degree of care ordinarily practiced by orthopedic surgeons; that Dr. Brown either lacked this skill or failed to use it in the operation on plaintiff; and that plaintiff's nerve was damaged as a result of that failure.
On this question plaintiff presented the testimony of Dr. Edward Eyring, an orthopedic surgeon practicing in Knoxville, Tennessee, who stated that Dr. Brown's medical treatment of plaintiff fell below the standard of care ordinarily practiced by orthopedistsparticularly in his failure to treat plaintiff conservatively for a reasonable period of time prior to surgery. However, asked specifically if the operation by Dr. Brown was justified, this witness replied:
"I can't answer that a straight yes or no. If he had done all of these other things then I wouldn't have any great, huge problem with it. I think to take a man straight to surgery out of your office when your tests are negative, your EMG is negative, when your arthrogram is negative and do the surgery after really never having observed him, I don't think that that's correct. You know, I'm not saying that under no circumstances would I ever explore a peroneal nerve for a guy that had this kind of pain."
As to the propriety of doing internal neurolysis, Dr. Eyring commented: "I believe that if the orthopedist is trained and knows what he's doing he ought to be able to do it."
Dr. Wharton testified that internal neurolysis was the proper surgical procedure when the operating surgeon found that a peroneal nerve was flattened due to external pressure. Dr. Wharton further concluded that the examination, diagnosis and medical treatment given to plaintiff by Dr. Brown complied with the standard of care expected of orthopedic surgeons confronted by similar circumstances.
Dr. Kline explained that an internal neurolysis is justified when "there's a partial injury to the nerve and I knew that some of it could be spared, as opposed to that which needs to be resected." Dr. Kline observed nothing during the course of his surgery that indicated any improper surgical procedure by Dr. Brown. He stated:
"The fact that some manipulation of the nerve took place and contributed to the foot drop does not mean that the original operation was carelessly and negligently performed."
*630 Dr. Altenberg also failed to detect any negligence on the part of Dr. Brown in his treatment of plaintiff, noting that upon the basis of the symptoms and findings "the operation would then be certainly justified."
A medical review panel on two separate occasions reviewed the evidence surrounding Dr. Brown's treatment of plaintiff and each time concluded that Dr. Brown did not fail to meet the applicable standard of care in his handling of plaintiff's case.
In the absence of manifest error an appellate court must not disturb the finding of the jury which has evidence before it furnishing a reasonable factual basis for its verdict, based upon its evaluation of witness credibility. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Here, the jury answered "no" to the following written interrogatory: "Do you find from a preponderance of the evidence that Dr. Douglas Brown was negligent in any aspect of his medical treatment of James Roy Rogers?"
Based upon our examination of the record, we cannot say that the jury was clearly in error in this finding, particularly in view of the evidence summarized above, which included the account of plaintiff undergoing several months of conservative treatment, to no avail, by two other physicians prior to his examination by Dr. Brown.
Furthermore, even if the trial judge erred in refusing to charge the jury as to the doctrine of res ipsa loquitur, our independent review of the record [as authorized by law, see Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975)] leads us to the conclusion that defendants, through the recited evidence, effectively rebutted any inference that the negligence of Dr. Brown was the most plausible explanation for the nerve damage suffered by plaintiff.
Alleged Lack of Informed Consent
Plaintiff asserts that Dr. Brown was also negligent in performing the surgical procedure upon plaintiff without first securing his informed consent and that the jury erred in failing to so hold. Although this was not expressly covered in the jury's answer to the quoted interrogatory, for the purpose of our discussion of this issue we assume that the jury at least impliedly made the finding alleged by plaintiff.
Specifically, plaintiff contends that the written consent form in question was not completed before he signed it. He further claims that Dr. Brown informed him the surgery would be for a torn muscle, with no mention of an operation on the peroneal nerve.
It is well established in our jurisprudence that the consent of a patient, express or implied, is required prior to a surgical procedure, and a surgeon who operates without such consent is liable in damages (even though not negligent in performing the surgery), except in case of an emergency requiring immediate surgery for preservation of life or health under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume that responsibility. The patient's consent must be an informed one, i.e., the physician has a duty to disclose all known information material to a patient's intelligent decision to undergo a particular operation or therapeutic procedure. That information should include a description and explanation of the proposed diagnostic, therapeutic or surgical procedure contemplated, the material risks involved and any alternatives available. Babin v. St. Paul Fire & Marine Ins. Co., 385 So.2d 849 (La. App. 1st Cir. 1980); Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843 (La.App. 3rd Cir. 1979); Percle v. St. Paul Fire & Marine Ins. Co., 349 So.2d 1289 (La.App. 1st Cir. 1977).
Dr. Brown testified that the consent form involved in this case was filled out when the plaintiff came to his office for his pre-operative examination; that the nurse completed a portion of the form and the physician completed the remainder; that he explained to plaintiff the general nature of the contemplated surgerynerve exploration and search for a pressure-causing mass, and that among the possible risks and complications *631 posited was nerve paralysis; that the completed form was then folded and handed to plaintiff to take to the hospital.
The nurse, Louise Ramsey, explained the customary procedure employed in completing these forms; stated that she was always in the room when the doctor made his explanation; and identified her handwriting together with that of Dr. Brown. She denied that the form was incomplete when it was signed by plaintiff.
Under the circumstances, considering that resolution of this question involved a matter of assessing witness credibility, we cannot say that the jury was clearly wrong in finding that plaintiff's informed consent was secured before Dr. Brown performed the surgery.
Decree
For the reasons set forth, we affirm the judgment of the district court, at appellant's cost.
NOTES
[1] The trial judge had charged the jury that where an "untoward event" occurred during an operation, the surgeon was required to show that it was not caused by his negligence. The appellant argued that this was a res ipsa loquitur charge. The appellate court disagreed, explaining that res ipsa loquitur does not apply where there is direct evidence of the cause of the injury, but that the doctrine of "untoward event" does apply in such case.
[2] A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.