452 So.2d 1258 (1984)
Joyce OSWALD, Tutrix of the Minor Children, Shannon Oswald and Stacey Oswald, Plaintiff, Appellant,
v.
RAPIDES IBERIA MANAGEMENT ENTERPRISES, INC., aka Bossier Health Care Center and Select Insurance Company, aka the Gulf Insurance Group, In Solido, Defendants, Appellees.
Nos. 16241-CA, 16242-CA.
Court of Appeal of Louisiana, Second Circuit.
June 6, 1984.
Writ Denied September 28, 1984.
*1260 Campbell, Campbell & Johnson by James M. Johnson, Minden, for plaintiff, appellant.
Bodenheimer, Jones, Klotz & Simmons by G.M. Bodenheimer, Shreveport, for defendants, appellees.
Before JASPER E. JONES, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
Joyce Oswald, individually and as tutrix of her minor children, Shannon Oswald and Stacey Oswald, appeals a jury verdict rejecting her claim for damages for the wrongful death of her husband against Rapides Iberia Management Enterprises, Inc., the owner and operator of the Bossier Health Care Center, a nursing home located in Bossier City and its insurer, Select Insurance Company a/k/a The Gulf Insurance Group, assigning two errors:
(1) The trial jury erred in failing to find that the Defendant, RAPIDES IBERIA MANAGEMENT ENTERPRISES, INC., was negligent and was responsible for payment of damages to Mrs. Oswald, and her two minor children, Shannon Oswald and Stacey Oswald; [and]
(2) The trial judge erred in failing to give a jury instruction with respect to the doctrine of res ipsa loquitur.

FACTS
Mrs. Oswald filed two suits, one individually and one as tutrix of her two minor children, against defendants (hereinafter collectively referred to as the "nursing home"), which were consolidated for purposes of trial and appeal. In her suits, she alleged that the nursing home was indebted to her and her children for the wrongful death of her husband, Donald Edward Oswald (hereinafter referred to as "Oswald") and indebted to her children as his heirs for damages suffered by him directly prior to his death. It was alleged that Oswald, a patient in the nursing home for an extended time prior to his death, was paralyzed and dependent upon the life support systems of the nursing home and its personnel *1261 to maintain his existence and that the nursing home, through its employees, was negligent in failing to properly monitor his life support systems and to timely note the changes taking place within his body which eventually led to his death.
Oswald was originally injured in an automobile accident which occurred in 1974. The injury to his brain stem resulted in his being left paralyzed [with limited use of his right arm and use of his left arm only], aphaysic [unable to speak] and incontinent [unable to control his bodily elimination functions]. However, he was able to read, watch television, visit with his family and communicate in a limited fashion by making sounds and gestures. Immediately after the accident, he was placed in a total care facility; however, after receiving therapy, he was placed in intermediate care nursing homes. This nursing home is an intermediate nursing care facility. During his stay at the nursing home, he was ambulatory through the use of a wheel chair, took his meals in the dining room for the most part, and participated in limited outside activities such as home visits on weekends and the Indoor Sports Club, a private club for the physically handicapped located in Shreveport.
In fact, during the evening hours of September 21, 1981, Oswald attended a meeting at the Indoor Sports Club. During the day shift on September 22, 1981, Oswald began complaining of leg and stomach pain and was medicated and put to bed. He also vomited. In the early morning hours of September 23, 1981, he began vomiting again. At first, the material which he regurgitated was observed to be normal contents of a stomach. The second time he vomited, it had the appearance of old blood. Immediately thereafter at approximately 2:00 a.m. he vomited bright red blood. The attending licensed practical nurse and the aide who had been staying with him, observed him to be pale, his skin to be cool and his stomach to be distended. The nurse could not get a blood pressure reading. Thereafter, she called the nursing home's physician whom she could not locate and then Mrs. Oswald. After she contacted Dr. McCuller, who was at the Bossier Medical Center, Oswald was transported by ambulance there.
At the time of his arrival at the hospital emergency room, Oswald had no blood pressure, was in shock and dehydrated and had a distended abdomen. When he was rehydrated, x-rays revealed pneumonia in both lungs. An initial diagnosis of a perforated ulcer was made and surgery was performed.
When Oswald's abdomen was opened, 2000 cc's of purulent bile stain were found in and around his intestines and air was found in his abdomen. Upon further exploration, a perforation of the pyloric channel of his duodenum was discoveredin laymen's terms, a peptic ulcer was found which was found to have been leaking for some period of time, possibly at least 36 hours. Because of the acid and bile which had drained into the abdominal cavity through the perforation of the stomach, peritonitis, an infection of the peritoneum or a burn like condition, which can cause shock, absessed formations and infection, and if left unattended, death, had set in.
After surgery, Oswald's earlier life threatening situation had improved to some degree. He was rehydrated and his blood pressure rose. However, his condition began to deteriorate and his fluid balance became critical because if he was given enough fluid to maintain urinary output, his lungs would fail and if fluids were decreased, his kidneys would fail. He continued to regress until he died on October 4, 1981 from cardio respiratory failure, related to pneumonia.

ASSIGNMENT OF ERROR NO. 1
Mrs. Oswald argues that the jury verdict was erroneous because there was ample evidence presented to prove that the nursing home breached the duty owed to Oswald to care for him reasonably in light of his mental and physical condition. It is contended that the nursing home breached its duty to Oswald and that he died as a result of its failure to provide proper care. The crux of this argument is that because *1262 the nursing home accepted the responsibility for the care of Oswald in his condition its personnel were under a duty to monitor him closely and provide the type of care required for a person in his incapacitated condition. It is essentially argued that because Oswald was unable to communicate sufficiently to call the doctor himself to report his perforated ulcer or the symptoms which accompanied it, that it was the duty of the personnel to watch him closely enough to observe his symptoms so that they could call the doctor when needed. It is contended that if they had cared for his needs properly that they would have called a doctor prior to the occurrence of the life threatening situation which resulted in hospitalization and that had a doctor been contacted sooner he would not have died.
The standard of conduct required of persons in Louisiana in their relationships with one another as a basis of delictual liability is set forth in La.C.C. Arts. 2315 and 2316:
Art. 2315
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Art. 2316
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
Persons are liable for acts of commission and omission that cause damage to another under these articles if a duty imposed by the relationship of the parties is breached by such act or omission. Dornak v. Lafayette General Hospital, 399 So.2d 168 (La. 1981). The elements of a cause of action under Articles 2315 and 2316 are fault, causation and damage. The existence of a legal duty coupled with a breach of that duty are prerequisites to any determination of fault. Seals v. Morris, 410 So.2d 715 (La.1982). Thus, under the duty risk analysis, it must first be determined if the defendant's actions or omissions caused plaintiff's injuries; if they did, then it must be determined whether defendant owed plaintiff a duty of care and whether that duty protects the plaintiff from the harm incurred. Ross v. Central Louisiana State Hospital, 392 So.2d 698 (La.App. 3d Cir. 1980).
In all cases, duty can be stated generally as the obligation to conform to the standard of conduct of a reasonable man under like circumstances. Seals v. Morris, supra. More specifically, the duty of care of a nursing home to its patients is to provide a reasonable standard of care, taking into consideration the patient's mental and physical condition. However, that duty does not include having a nurse or attendant with the patient at all times. Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3d Cir.1971).
Once the applicable standards of care are established, negligence is a question of fact to be determined by the trier of fact, judge or jury. In the absence of manifest error, a reviewing court should not disturb these factual determinations. In order to find manifest error, the record must support the conclusion that the factual determinations were clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Prestridge v. Commercial Union Assurance Companies, 413 So.2d 959 (La. App. 3d Cir.1982).
Mrs. Oswald's argument that there is ample evidence to prove that the nursing home breached its duty and that the breach of duty resulted in the death ignores the evidence in the record which contradicts or qualifies her contention.
Four physicians were qualified as experts and testified on behalf of Mrs. Oswald. Of these four witnesses, only one would unequivocally state that the standard of care provided by the nursing home personnel fell below a reasonable standard of care.
Dr. George McCormick, the Bossier Parish Coroner, had not treated nor seen Oswald, however, based on his examination of the hospital records, the nursing home records, and his conversations with Oswald's treating physicians, he opined that the nursing home was negligent in failing *1263 to call a doctor prior to the time that Oswald started vomiting bright red blood.
However, the treating physicians called were not so unequivocal although each stated that normal people who can communicate will let someone know immediately when an ulcer perforates because this is a very painful and striking occurrence.
Dr. John T. Austin, the surgeon who operated on Oswald opined that from the nurses' notes he could not determine the seriousness of Oswald's illness prior to the 2:00 a.m. vomiting incident. He did state that if the personnel who were treating Oswald had known how sick Oswald actually was they should have contacted a physician sooner than they did. However, he did not know how much Oswald was able to tell the nurses. He further stated that he could not determine whether it was more probable than not that Oswald was able to communicate prior to the surgery and he assumes that could only be determined by those who were treating him. He did state that he could find nothing in the nurses' notes which would have logically forced them to obtain medical help before they did, and that as far as the notes indicate until the time when Oswald started vomiting blood, a nurse had no way of knowing that he had a perforated ulcer. He further stated that he could not tell whether the nursing home personnel should have grasped the situation prior to the time that they did and that there seemed to be no indication from those who were watching him that anything was occurring of this severity. While he states that he could not say what was going on prior to the vomiting of the blood, he did state that it did not appear from what was recorded that the personnel were neglectful.
Dr. Charles A. Powers, an internal medicine specialist, examined Oswald on September 25, 1981. While he could and did testify as to the condition of Oswald on the date of his examination and subsequently, he stated that he could not testify as to how long he had been ill. He stated that he thought that a physician should have been contacted sooner; however, when specifically asked if the nursing home personnel waited too long to do anything for Oswald, he responded that such was a judgment call and he really did not know. He did admit that the mere act of vomiting would not indicate a perforation and indicated that he had no independent way to determine when the ulcer had actually perforated.
Dr. C.H. McCuller admitted Oswald to the hospital. While he states that "possibly" a doctor should have been consulted earlier about Oswald's condition, when asked if the employees at the home based on their notes had waited too long to call, he answered that possibly they could have called earlier if they were aware of what was going on. Upon reviewing the nurses' notes with defense counsel, this witness stated that the first indication that Oswald needed hospitalization was on September 23, 1981 at 2:00 a.m. This witness further stated that according to the nurses' notes, he knew nothing the personnel could have done that they did not do.
The physician called on behalf of the defense was Dr. Frank Dienst, an internal medicine specialist. He based his testimony on his review of Oswald's records. It was his firm opinion that there was no indication that he could determine of neglect on the part of the nursing home personnel. He felt that the best of physicians would have handled the situation exactly as it was handled. He admitted that the difficulty in this case was the fact that Oswald could not communicate well with his attendants and they had to use their own best judgment to guide them in making decisions regarding his care. He continually opined that there was no point of real neglect in the management of his case. He disagreed with any statement that Oswald should have seen a physician much earlier stating that the point where everything really started was when he bled. He further opined that he did not know how anyone could have been notified earlier and that there was no reason to call a doctor or send Oswald to the hospital prior to the vomiting of the blood.
*1264 The nursing home personnel who had cared for Oswald testified and all stated unequivocally that Oswald experienced no symptoms which gave them cause for alarm prior to the vomiting of the blood. All stated that they were able to communicate with Oswald and that he was able to effectively let them know when he was hurting or if there was something wrong with him. Other than his usual complaints of leg pain, several prior incidents of vomiting which did not appear to be unusual or which were controlled with medication, and complaints of stomach pain and hurting all over during the day shift on September 22, Oswald never indicated to any of the witnesses that his condition was serious. When Oswald vomited the first time on September 22, he was cleaned up and put to bed. An aide was left with him. Nothing else unusual was noted until he vomited again shortly after midnight but not in an unusual fashion. However, when the vomiting continued and resembled old blood, the nurse on duty was notified. When the bright red blood was vomited, the doctor was notified immediately.
Specifically, the nurse on duty at the time that the situation became critical stated that nothing had occurred earlier that made her feel it was necessary to call a doctor. The nurse on the early day shift also stated that she observed nothing seriously unusual about Oswald's condition although he had vomited a moderate amount but not in an unusual manner. She stated that he had complained of pain and had been put to bed for comfort. She reiterated that she had observed nothing unusual. A nurses' aide on duty during the late day shift stated that she also had observed no particular problems with Oswald.
Although admittedly incomplete in some respects but complete to the extent that they cover at least 72 hours prior to the emergency situation, the nurses' notes substantiate the testimony of these witnesses and fail to disclose anything which in and of itself would require hospitalization or notification of a doctor prior to the actual notification.
Additionally, Udessa Sewell, a volunteer worker for the Indoor Sports Club testified that she had seen Oswald at the meeting the night of September 21, 1981, had observed nothing extraordinary, and his appearance was normal.
Finally, no physician who testified was willing to state without reservation that Oswald probably could have been saved had his condition been noted sooner. Not even Dr. McCormick, whose testimony was the most favorable to the plaintiff's case, was willing to say that more probably than not Oswald's death could have been prevented had he been seen sooner. Furthermore, it was the firm opinion of Dr. Dienst that there was no causal connection between the peritonitis caused by the perforated ulcer and the resulting pneumonia which ultimately caused the cardio respiratory failure which led to death.
Unfortunately, in this case as in all other jury cases, we are unaware of the factual considerations which the jury used to reach its ultimate verdict. However, in this case, in order to arrive at a decision, the jury was required to make credibility determinations. Credibility determinations made by the trier of fact are entitled to great weight. Succession of Winfield, 376 So.2d 997 (La.App. 1st Cir.1979). The question of assessment of the credibility of competing expert witnesses is best left to the trier of fact who has the opportunity to observe the respective demeanor of the witnesses. Simoneaux v. Davis, 397 So.2d 835 (La.App. 4th Cir.1981). Where there is evidence before the trier of fact which upon its reasonable evaluation as to credibility, furnished a reasonable basis for the finding, it should not be disturbed in the absence of manifest error, i.e., clearly wrong. Ardoin v. Evangeline Parish School Board, 376 So.2d 372 (La.App. 3d Cir.1979).
Accordingly, the facts related above are some of the facts contained within this record which the jury could have accepted as being credible and relied upon to reach its conclusion that the nursing home was not negligent in its care of Oswald *1265 and that there had been no proof of a causal connection between any care received by Oswald and his ultimate death. While it is certainly possible that presented with the evidence contained within this record another jury might have found otherwise, the jury chosen to try this case did not. The standard for changing a finding of fact by a jury is clear error and that standard has not been shown because the record contains ample proof, if believed, to support the jury's finding. Soileau v. South Central Bell Telephone Company, 406 So.2d 182 (La.1981); Prestridge v. Commercial Union Assurance Companies, supra.

ASSIGNMENT OF ERROR NO. 2
It is finally argued that the trial judge erred when he refused to give a jury instruction on the doctrine of res ipsa loquitur. Thus, the critical question presented here is whether the doctrine should have been found to be applicable and the jury so instructed.
The doctrine of res ipsa loquitur becomes applicable when the circumstances surrounding the incident in question (here the "illness which caused his death") are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the injury was due to the negligence of the persons (here the nursing home personnel) having control of the thing involved in the injury. In essence, this inference of negligence may be drawn because all of the circumstances surrounding the injury are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the injury was due to some breach of the defendant's duty. Rogers v. Brown, 416 So.2d 624 (La.App. 2d Cir. 1982).
In reality, the doctrine of res ipsa loquitur is simply another formulation of plaintiff's burden in a tort action to prove that, more probably than not, his injury was caused by defendant's negligence. However, before charging the jury on the propriety of drawing this inference of negligence from the circumstances, it is necessary that the trial judge decide the applicability of this doctrine by addressing these threshhold questions; (1) did the injury occur while plaintiff's body was in the exclusive custody of the defendants and (2) was the injury one which ordinarily does not occur in the absence of negligence; i.e., was the nursing home's negligence the most plausible explanation of the "reason why Mr. Oswald became so ill that he ultimately died"? Rogers v. Brown, supra.
Because the answer to question (1) is no, since during the "illness which caused deceased's death" his body was also in the care, custody and control of the Bossier Medical Center and his treating physicians for approximately twelve days prior to his death, it is really unnecessary that we inquire further before determining that the trial judge did not err in refusing to give this instruction. However, in answer to question (2), we note from our independent review of the record that there is no proof that more probably than not, Oswald's death could have been prevented had the nursing home sought medical attention for him at an earlier time after his ulcer perforated. From our review of the record, we also note that even if the failure to give this jury instruction was erroneous, there is sufficient evidence, if believed by the jury, contained within this record to effectively rebut any inference that the negligence of the nursing home was the most plausible explanation of "why Mr. Oswald became so ill that he ultimately died." Compare Rogers v. Brown, supra.
For the foregoing reasons, the jury verdict is affirmed at appellants' cost.
AFFIRMED.