541 So.2d 969 (1989)
Robert D. POOL, Sr., Plaintiff-Appellant,
v.
MISSOURI PACIFIC RAILROAD COMPANY, Defendant-Appellee.
No. 20421-CA.
Court of Appeal of Louisiana, Second Circuit.
March 29, 1989.
Writ Denied May 19, 1989.
*970 J. Peyton Moore, Francis M. Gowen, Jr., Shreveport, for plaintiff-appellant.
Cook, Yancey, King & Galloway by Edwin L. Blewer, Jr., Lunn, Irion, Johnson & Salley & Carlisle by James B. Gardner, Hicks & Bookter by S. Maurice Hicks, Jr., Shreveport, for defendant-appellee.
Before HALL, MARVIN and LINDSAY, JJ.
LINDSAY, Judge.
The plaintiff, Robert D. Pool, Sr., appeals a trial court judgment in favor of Missouri Pacific Railroad Company (MOPAC), rejecting his claims for damages for personal injury. For the following reasons, we affirm.

FACTS
The plaintiff was employed as a forklift operator at GNB Battery, Inc. (GNB) in Shreveport. GNB was engaged in manufacturing auto and marine batteries. A railroad spur was laid into GNB's loading docks. On a daily basis, MOPAC would send switch engines into the plant, leave empty boxcars or cars loaded with supplies, and remove boxcars loaded with batteries. The following diagram depicts the arrangement of the loading dock and the "dock plates" described hereafter.

The boxcars were spotted beside the loading docks. A heavy metal ramp called a "dock plate," which connected the loading dock with a boxcar, was placed partially on the dock and partially in the door of the boxcars so that workers and forklifts could go in and out of the boxcars for loading and unloading. The dock plates must be removed by forklift before boxcars can be moved by rail from the loading dock area. The dock plates measure approximately four feet by ten feet. "Spacers" are welded to the dock plates to prevent movement when the dock plates are in use. Each dock plate has a set of stirrups in the middle. When a dock plate is to be moved, the stirrups are pulled up by hand, the forks of a forklift truck are then inserted in the stirrups and the dock plate is lifted from its position between the dock and the boxcar. The dock plate is then placed on the dock.
The GNB loading dock also has a movable bridge connecting the loading dock and the lead oxide building which is located on the southside of the tracks. Boxcars which were used for transporting supplies and completed batteries were docked on the west side of the bridge. To the east of the bridge, railroad cars containing lead oxide were docked.
Plaintiff alleged that as a forklift operator he worked the loading dock, and among his duties he was required to prepare boxcars which were parked at the dock for movement by MOPAC trains and their crews. Plaintiff alleged that according to normal practice, before MOPAC sent *971 switch engines to the GNB plant to switch boxcars, MOPAC employees would call ahead to alert GNB that the train would soon arrive. Expecting a switch engine and train to arrive, plaintiff would then remove any dock plates on boxcars so that the engine could safely couple with and move the boxcars without causing damage to the cars, the dock plates or the loading dock.
On the date the accident allegedly occurred, August 8, 1983, the cars in spots number 10 and 11, as shown on the above diagram, were loaded with batteries. These boxcars had been sealed and were to be removed from the plant. The car in the number 12 spot was to be placed in the number 10 spot and two empty boxcars, brought into the plant by the switch engine, were to be placed in spots 11 and 12.
The facts and events which surround the alleged accident are disputed, as noted hereafter. However, according to the plaintiff, around 2:30 a.m. on August 8, 1983, MOPAC sent an engine to GNB without first calling ahead. The plaintiff claims when he saw the train approaching from the west, he began moving dock plates. The plaintiff claims that, as he was standing on one of the dock plates attempting to raise the stirrups, the train engine backed into the boxcars to couple up and that as a result of the impact of the engine hitting the boxcars, he was jarred and thereby received a injury to his back.
The plaintiff claims he shouted at the railroad workers at the far west end of the dock and then went to report his injury to his supervisor, Glen Bailey. The plaintiff claimed that his injuries were so painful he could not continue working that morning. After talking to his supervisor, plaintiff left the plant and sought medical attention at the emergency room of the Willis-Knighton Hospital. The plaintiff was treated and released.
The next day, plaintiff consulted his personal physician. Although the plaintiff had previously undergone back surgery, it was determined that he had new injuries affecting discs in his back. On October 22, 1983, plaintiff had a chemonuclyeolysis, which involved an injection into the disc. This failed to relieve the plaintiff's symptoms and on February 2, 1984 he had a laminectomy and discectomy. This procedure also failed to relieve the plaintiff's symptoms and on March 14, 1984, the plaintiff had a total laminectomy. As a result of this back injury, the plaintiff was unable to return to work at GNB.
GNB refused to pay worker's compensation benefits. Thereafter, the plaintiff filed suit against GNB and its worker's compensation insurer, Transportation Insurance Company, for worker's compensation benefits. The plaintiff also filed a separate tort suit against MOPAC. MOPAC filed a motion to consolidate the cases for trial. The motion was denied and the worker's compensation case went to trial without the participation of MOPAC or its counsel.
The plaintiff was the only witness to this alleged accident. In the worker's compensation case, the trial court found in favor of the plaintiff, holding that he did suffer a work related injury, and awarded benefits for total and permanent disability.
The worker's compensation judgment was appealed to this court, on appeal, this court amended the trial court judgment and awarded benefits for temporary, total disability. The trial court judgment was otherwise affirmed. Pool v. GN Batteries, Inc., 480 So.2d 898 (La.App. 2d Cir.1985).
In plaintiff's tort suit against MOPAC, he claimed the negligence of the train crew caused his injury. Transportation Insurance Company, the worker's compensation insurer of GNB, filed a petition of intervention seeking reimbursement of worker's compensation benefits, should the plaintiff be successful in his suit against MOPAC.
MOPAC filed a third party demand against GNB and Transportation Insurance Company claiming that the predecessors of MOPAC and GNB had entered into an industrial track agreement. According to this agreement, GNB was allowed to place their loading docks closer than the standard clearance of eight and one-half feet from the railroad track and GNB agreed to hold MOPAC harmless for any and all liability *972 for injury, death and damages caused by, arising out of or incident to the provision, maintenance, use or existence of the loading dock having less than the standard clearance of eight and one-half feet.
Prior to the instant trial, the record reveals that the plaintiff testified and gave several pretrial statements. The plaintiff related his version of the accident to his supervisor, Glen Bailey, to a claims representative with GNB, Robert Wheeler, and to the personnel manager at GNB, Sam Lee, in addition to testifying at the first trial in the worker's compensation case. He also gave a pretrial deposition prior to the present trial. The plaintiff was not consistent in his allegations as to how he could have been injured by the actions of the MOPAC crew. As a result of these inconsistencies, it became impossible to determine how the alleged accident occurred and apparently affected significantly the trial court's perception of plaintiff's credibility.
For example, plaintiff was inconsistent in describing which dock plate he was on when the accident occurred, and whether he was actually knocked down or merely jarred. The plaintiff also claimed that the impact knocked an angle iron loose on the loading dock and that it was sticking up in the air two to three feet. (An angle iron is a metal strip placed on the edge of the loading dock to protect the concrete.) At one point, he also stated that the dock plate had been knocked up onto the dock as a result of the coupling procedure, and, at another point, stated that as a result of the impact, the dock plate was left partially on the dock and partially in the door of one of the boxcars.
GNB officials who examined the loading dock shortly after the alleged accident and the next morning could find no physicial damage to any dock plates nor did they find a newly damaged angle iron. No one ever reported any damage to any of the boxcars.
Members of the train crew which carried out the switching procedure on the date of the alleged accident also gave pretrial statements to GNB's claims representative and testified at the workers compensation trial, as well as at the trial of the present tort suit. The train crew consisted of the engineer, Robert Lasiter, the conductor, Gerald McClaran, and two brakemen, Eric Hartman and Robert Goins. The import of their trial testimony was that no one was injured as a result of their activities. They testified that they approached the GNB plant with a switch engine and two empty boxcars. They first deposited the two empty boxcars on the "turn around" track. Then, they approached the GNB dock with only the switch engine. They stopped the engine short of the GNB plant and the brakemen opened a gate to allow the engine into GNB's premises. The engine then proceeded toward the line of boxcars at the loading dock, again stopping a few feet short of the first boxcar. The brakemen left the train and went onto the loading dock, checked the cars and, finding that everything was safe, signaled the engineer to move forward and couple with the boxcars which were to be moved. Upon receiving the signal, the engineer moved the engine forward and accomplished a normal coupling maneuver. The crew testified there were no dock plates in position between the dock and any of the boxcars, nor were they aware of anyone being injured. Although the brakemen, Hartman and Goins, saw a man sitting on a forklift on the dock, there was no conversation or indication of injury or other problem. The MOPAC crew proceeded to complete their switching maneuver, removing the two loaded and sealed boxcars, and leaving the two new empty boxcars. The MOPAC crew and train then departed the area. The MOPAC crew testified that the events which occurred were unremarkable.
Following a lengthy trial, the trial court took the case under advisement. On April 26, 1988, the trial court rendered written reasons for judgment. The trial court found that in light of plaintiff's inconsistent statements, he was simply not a credible witness. The trial court found that the accident could not possibly have happened in the manner claimed by the plaintiff. The trial court found that the train could not have pulled the boxcars out of the plant *973 without first removing the dock plates and noted that the plaintiff failed to provide any explanation of how the dock plates were moved after his injury.
The trial court stated that the plaintiff was injured at work. However, the injury was not attributable to MOPAC or its crew. The court speculated that the injury may have occurred when the plaintiff was trying to place the dock plates into the new boxcar in spot 12 after the train crew left.
The plaintiff appealed, essentially urging that the trial court erred in finding that he failed to carry his burden of proving that the accident was caused by the negligence of MOPAC and erred in failing to award him damages based upon that negligence. The plaintiff argues the trial court erroneously found the plaintiff not to be a credible witness and erroneously based its judgment on the impeached and biased testimony of the MOPAC employees who were operating the train on the date in question. The plaintiff also argues the trial court erred in speculating that the accident must have occurred after the MOPAC train left the GNB battery plant.

BURDEN OF PROOF
Plainly and simply stated, the trial court did not believe the plaintiff's testimony that he injured his back when the MOPAC crew coupled with the boxcars while the plaintiff was standing on a dock plate. After reviewing the record, we cannot say that the trial court was clearly wrong or committed manifest error. Therefore, we must affirm the trial court ruling denying the plaintiff's claim for damages.
It is well-settled that questions of witness credibility are properly allocated to the trier of fact and are accorded great weight by appellate courts. In the absence of manifest error, such findings will not be disturbed on appeal. Wattik v. Lewis Grocer Company, 476 So.2d 444 (La.App. 2d Cir.1985); Martin v. Martin, 469 So.2d 1108 (La.App. 2d Cir.1985); Chapman v. Belden Corp., 428 So.2d 396 (La.1983).
The elements of a cause of action in a tort suit, such as the present one, are fault, causation and damage. Weiland v. King, 281 So.2d 688 (La.1973); Thomas v. Missouri Pacific Railroad Company, 466 So. 2d 1280 (La.1985); Ballew v. Southland Corporation, 482 So.2d 890 (La.App. 2d Cir.1986).
The plaintiff has the burden of proving every element of his cause of action and, in addition to proving tortious conduct, he must also establish a causal link between the defendant's act or omission and his damages. White v. Cumis Insurance Society, 415 So.2d 574 (La.App. 3rd Cir.1982), writ denied 420 So.2d 164 (La.1982); Lambert v. State Farm Mutual Automobile Insurance Company, 184 So.2d 107 (La. App. 4th Cir.1966).
In a tort suit, negligence is never presumed and the plaintiff bears the burden of establishing his claim to a legal certainty by a reasonable preponderance of the evidence. Mere possibilities and even unsupported probabilities are insufficient to support a judgment. Stewart v. Hanover Insurance Company, 416 So.2d 286 (La.App. 3rd Cir.1982), writ denied 421 So. 2d 907 (La.1982); Broussard v. Continental Casualty Company, 421 So.2d 341 (La. App. 1st Cir.1982), writ denied 423 So.2d 1165 (La.1982); Fogleman v. Piggly Wiggly Operators Warehouse, Inc., 347 So.2d 75 (La.App. 2d Cir.1977), writ denied 351 So.2d 155 (La.1977); Starks v. Kelly, 435 So.2d 552 (La.App. 1st Cir.1983).
By a preponderance of evidence is meant evidence which is of greater weight, or more convincing than that which is offered in opposition to it. It is evidence which, as a whole, shows that the fact or causation sought to be proved is more probable than not. Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366 (La.App. 2d Cir.1988). Preponderance of the evidence may be said to be that part of the evidence which, because of its apparent correctness, its convincing nature, and its quality or its weight, tips the scale in favor of the party upon whom the burden of proof rests. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (La.1972).
The proof of negligence may be established by direct or circumstantial evidence. *974 Boudreaux v. American Insurance Company, supra. However, a party relying upon circumstantial evidence bears his burden of proof only if the evidence, taken as a whole, shows that the defendant's fault is the most plausible cause of damage and no other factor can reasonably be ascribed as the cause. Evans v. Gentry & Holder Floors, Inc., 349 So.2d 1367 (La. App. 2d Cir.1977); Fogleman v. Piggly Wiggly Operators Warehouse, Inc., supra; Blanchard v. Sotile, 394 So.2d 633 (La. App. 1st Cir.1980), writ denied 399 So.2d 601 (La.1981).
In the present case, the plaintiff had the burden of proving by a preponderance of the evidence that the negligence of the MOPAC train crew resulted in his injury. In arriving at a decision as to how the accident happened and whether plaintiff's injuries resulted from MOPAC's negligence, plaintiff's testimony is crucial, since he is the only witness to the alleged accident. However, plaintiff gave several different versions of where he was when the accident occurred and how it happened. His testimony was also different from the testimony of the railroad employees as to what occurred on the morning in question.
Plaintiff's first version of how the accident occurred was given to his supervisor, Glen Bailey, shortly after the plaintiff claimed to have been injured. Bailey testified that the plaintiff first told him that the train had run over him. He then told Bailey that he was standing on a dock plate on the west end of the dock when the accident occurred. According to Bailey's testimony,[1] he and the plaintiff walked out to the loading dock to determine what had happened. Bailey said that if a boxcar had been pulled out without first removing the dock plate that "something will be torn up." Bailey did not note any damaged boxcars or dock plates. He testified that there was one dock plate on the far west end of the loading dock which was slightly askew or "cockeyed," rather than in its normal position parallel with the edge of the dock. However, he did not see a damaged angle iron sticking out two to three feet into the air as the plaintiff claimed.
Sam Lee, the human resource manager at GNB at the time the plaintiff's injury occurred, talked with Bailey later on the morning of August 8, 1983. The two men inspected the loading dock and found no damage to the dock, the dock plates or the box cars. One angle iron was noted to be loose but was not sticking out as claimed by the plaintiff.
Lee later spoke with plaintiff while the plaintiff was in the hospital. The plaintiff told him that when the accident occurred he was on the dock plate of the first boxcar on the west end of the loading dock.
The plaintiff also made a statement to Robert Wheeler, a claims representative for MOPAC. The statement was given on September 20, 1983, the date the plaintiff returned home from the hospital after back surgery. At that time, the plaintiff told Wheeler that when the accident occurred, he was working on the boxcar at the west end of the dock and that there were no other boxcars between his car and the train engine when the coupling took place. He said that the impact did not knock him down. After the incident, he left everything on the dock, including his forklift, and walked to Bailey's office. He also said that when Bailey returned with him to the loading dock, Bailey saw the damaged angle iron. Bailey refuted this in his testimony.
At the trial of the worker's compensation case, the plaintiff testified that when the accident occurred he was on the dock plate of the second boxcar when the train coupled up. Plaintiff's testimony indicates that he was counting the boxcars from west to east.
Prior to the trial of the present case, counsel for MOPAC took the plaintiff's deposition. At that deposition, the plaintiff stated that on the date of the accident he saw the train approaching; he removed the bridge to the lead oxide building and was in the process of moving "at least" one dock *975 plate when the train coupled up and caused his injury. The plaintiff said he did not know whether there were any boxcars between the boxcar and dock plate he was standing on and the engine when the coupling occurred. He also didn't know which car he was working on and he stated that he did not move any dock plates after the accident occurred.
He then stated that he fell over on the dock plate, later regained his senses and drove his forklift into Bailey's office. Plaintiff stated that when he and Bailey returned to the docks, the car he had been working on was still in place, that the angle iron was "pushed out" one and a half feet and the dock plate was situated half-way in the boxcar and half-way out. These statements were not verified by Bailey's testimony.
Not only is there a lack of corroborative testimony to support the plaintiff's contention that the dock plate was knocked onto the loading dock during the coupling procedure, but we also find no credible physical evidence in the record that any of these heavy dock plates, if they had originally been in position between a boxcar and the loading dock, could have been "thrown" or propelled up onto the dock during coupling. The proposition that a dock plate could be "thrown" onto the dock appears to be illogical and no expert testimony was presented on this point.
At the trial of the present case, the plaintiff said he did not remember how many dock plates he removed before the accident, if he had in fact removed any at all.
He stated he did not know which dock plate he was on when the accident occurred but at that time he was working east to west in removing the dock plates. The plaintiff also stated that he was knocked down and later drove his forklift to Bailey's office.
The plaintiff discounted his testimony at the worker's compensation case in which he stated that he was on car number 2 when the accident occurred. At this time he stated he did not remember which car he was on.
The plaintiff also testified that Bailey "could have" testified that the train hit the box car and caused damage. Bailey did not substantiate plaintiff's assertions.
As noted previously, the members of the train crew also testified at trial. They denied that they had done anything which could have caused plaintiff's injuries. The conductor, Gerald McClaren, stated that he was simply not in a position to see whether any dock plates were in place in the boxcars. However, the engineer, Robert Lasiter, testified that as the train approached the GNB loading dock he could see up and down the dock and saw no one on the loading dock and saw no dock plates in place. He stopped his engine short of the boxcars which were to be switched and waited for the brakeman's signal that it was safe to couple. When the signal came, he moved the engine toward the stationary boxcars and accomplished a normal couple.
Eric Hartman, one of the brakemen on the MOPAC crew, testified that he walked the dock and no dock plates were in place, but that he did see a man on the loading dock sitting on a forklift. Robert Goins, the other MOPAC brakeman, testified that he also walked the dock and saw a man sitting on a forklift. Goins stated that no dock plates were in place. We note, however, that Goins was effectively impeached on this latter point as he had previously given a statement to the contrary to Robert Wheeler that some dock plates were in place.
The plaintiff particularly argues that the trial court erred in finding that he was not a credible witness, even though he was found to be credible in his worker's compensation case, both by the trial court and by this court on appeal. However, the issue in the worker's compensation case was whether the plaintiff was injured during the course and scope of his employment so as to entitle him to worker's compensation benefits. The issue in that case was not, as it is here, how the plaintiff was injured or by whom. Neither the trial court judge nor this court are bound by the credibility findings in the worker's compensation case which had different issues.
*976 At the trial of the present case, the plaintiff related a different version of how this accident occurred than he related at the worker's compensation trial. The trial court in the present case had before it the plaintiff's numerous inconsistencies as well as having the opportunity to observe the plaintiff and his demeanor. From this record, we cannot conclude that the trial court erred in its credibility determination.
After reviewing all the testimony and statements given by the plaintiff and the train crew and after evaluating the physical evidence and the lack thereof, we find no manifest error in the trial court's factual determination that the plaintiff failed to prove that he was injured as a result of the negligence of MOPAC and its employees. The plaintiff proved that he suffered a back injury at some time during the course and scope of his employment. However, the inconsistencies in plaintiff's statements and testimony leave many unanswered questions. Under the circumstances, the trial court did not err in finding that there was insufficient evidence to support a judgment in plaintiff's favor.
We recognize the testimony of Robert Goins' contradicted earlier statements made to the investigator, Robert Wheeler. However, Goins' prior inconsistent statement testimony alone is not sufficient to carry the plaintiff's burden of proof. The testimony of all members of the train crew was consistent in the description of events which transpired during the coupling operation and the testimony that the man on the forklift was uninjured when the crew members saw him.
In addition, the plaintiff was cross-examined concerning his prior medical history and prior claims for work-related injuries. The plaintiff's work record contained indications of numerous medical problems. However, the plaintiff denied memory of many of these conditions. The fact that the plaintiff professed "not to remember" many of these conditions undoubtedly also had a significant negative effect on the trial court's perception of his credibility.

RES IPSA LOQUITUR
The plaintiff further argues that the doctrine of res ipsa loquitur applies to this case and that through the application of this doctrine an inference of negligence has been shown on the part of MOPAC. This argument is meritless.
The doctrine of res ipsa loquitur is a rule of circumstantial evidence that normally comes into play only at the conclusion of the trial. The rule applies in any negligence action when the circumstances surrounding the incident in question are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the injury was due to the negligence of the persons having control of the thing involved in the injury. Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258, writ denied 457 So.2d 14 (La.1984). The doctrine applies when circumstances suggest that the defendant's negligence is the most plausible explanation for the injury. Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976).
It should be noted that the doctrine of res ipsa loquitur does not dispense with the requirement that the plaintiff prove negligence by a preponderance of the evidence. A plaintiff relying on res ipsa loquitur must prove circumstances which create an inference of negligence on the part of the defendant. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984).
The inference of negligence is drawn because all of the circumstances surrounding the accident are of such a character that the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty and that there is no other reasonable or logical explanation for the occurrence of such an accident. Boudreaux v. American Insurance Company, supra.
The plaintiff may not avail himself of the doctrine of res ipsa loquitur where the hypothesis that the plaintiff's injuries were not caused by the defendant's negligence is equally as plausible as the postulate that the injuries were caused by the defendant's *977 negligence. Morgan v. Willis-Knighton Medical Center, supra.
The plaintiff has failed to show that the circumstances of his injury are of such character that the only fair and reasonable conclusion is that the accident was due to the negligence of MOPAC. As found by this court in the worker's compensation portion of this case, Pool v. GN Batteries, Inc., supra, the plaintiff did show at that trial that he was injured on the job. However, in light of the growing number of inconsistencies and the lack of physical evidence supporting the plaintiff's claim, we cannot say how the plaintiff was injured, and, therefore, we are unable to say that he was injured as a result of the fault of MOPAC and its employees. The plaintiff has failed to provide a plausible and consistent explanation of how his injury occurred, nor has he shown that MOPAC was negligent toward him in any way. Therefore, the doctrine of res ipsa loquitur is of no benefit to plaintiff in this case.

CONCLUSION
For the above stated reasons, we affirm the decision of the trial court, rejecting the claims of the plaintiff, Robert Pool, against the defendant, MOPAC.
We also affirm the trial court judgment rejecting the claims made in the intervention filed by Transportation Insurance Company. The trial court also correctly concluded that the third party demand filed by MOPAC against GN Batteries, Inc., and Transportation Insurance Company is moot.
Accordingly, the judgment of the trial court is affirmed, at plaintiff's costs.
AFFIRMED.
NOTES
[1] A transcript of Mr. Bailey's testimony given at the worker's compensation trial was introduced into evidence in the present trial due to the death of Mr. Bailey.