448 So.2d 813 (1984)
Harold Wayne DOSS, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY and Dr. George Belchic, Jr., Defendants-Appellees.
No. 16,073-CA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1984.
Writ Denied May 11, 1984.
Campbell, Campbell & Johnson by James M. Johnson, Minden, for plaintiff-appellant.
Cook, Clark, Egan, Yancey & King by Sidney E. Cook, Shreveport, for defendants-appellees.
Before PRICE, HALL and JASPER E. JONES, JJ.
PRICE, Judge.
Plaintiff, Harold Wayne Doss, appeals a judgment in favor of defendant, Dr. George Belchic, Jr., and defendant's insurer, Hartford Fire Insurance Company, in a medical malpractice action. The judgment *814 of the trial court is affirmed for the following reasons.
The evidence reveals that plaintiff, Harold Wayne Doss, was a postal carrier and had been employed as a postman by the U.S. Postal Service since 1965. His duties entailed walking a route of approximately fifteen miles a day to deliver mail in Minden, Louisiana.
Sometime in 1973 or 1974, Doss developed calluses on the bottom of his right foot which made walking extremely painful.
After removal of the calluses by cutting and burning proved unsuccessful, plaintiff consulted with defendant, Dr. George Belchic, Jr., an orthopedist in Shreveport, in August 1976. Dr. Belchic diagnosed plaintiff's problem as metatarsalgia of the second and fifth metatarsal bones. Simply, metatarsalgia is a malalignment of the bones in the foot. This malalignment resulted in the growth of the painful calluses.
Dr. Belchic explained to Doss that there were two alternative forms of treatment, either surgery or the use of a metatarsal bar or pad in plaintiff's shoe. Plaintiff elected to have the surgery which was performed at Highland Hospital in Shreveport, Louisiana on August 6, 1976.
The surgical procedure is known as a dorsal wedge osteotomy. An incision was made on the top of the foot and a small wedge or "v" was removed from each malaligned metatarsal bone. The procedure involved a surgical fracture of the bones. The purpose of the surgery was to allow the mal-aligned bones to seek the same level as the other metatarsal bones.
After the surgery, plaintiff continued to consult with defendant, Dr. Belchic, for post-operative evaluations until September 28, 1976, when plaintiff dismissed himself from Dr. Belchic's care.
Doss testified that he continued to have pain and problems with his foot after the surgery. He was subsequently diagnosed as having a non-union of the second metatarsal bone which was resolved by a sliding bone graft performed by Dr. W.W. Fox in April 1978. A non-union is simply when the fracture fails to heal. The expert evidence at trial established that approximately 10 to 15 percent of osteotomies result in a non-union and even a smaller percentage of these non-unions become symptomatic. There appears to be no medical explanation as to why a non-union occurs in some patients. Plaintiff claims that his foot continued to be painful and problematic allegedly causing balance problems which resulted in a fall in 1981. This fall caused a serious back injury which eventually lead to plaintiff's retirement from the U.S. Postal Service in 1982.
Initially plaintiff instituted this action asserting various alleged acts of medical malpractice on the part of the defendant, Dr. Belchic. After a trial on the merits, the jury found in favor of the defendants. On appeal, plaintiff has apparently abandoned his claims that the osteotomy was improperly performed and has limited his claim to the following issues:
(1) Did Dr. Belchic give plaintiff sufficient information to enable plaintiff to give informed consent to the dorsal wedge osteotomy; and
(2) Did this information have to be contained in written consent form to be valid under La.R.S. 40:1299.40?
The "... consent of a patient, expressed or implied, is required prior to a surgical operation, and a surgeon who operates without such consent is liable in damages except in case of an emergency requiring immediate surgery for preservation of life or health, under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume such responsibility." Harwell v. Pittman, 428 So.2d 1049 (La.App. 1st Cir.1983) at p. 1053 and numerous citations therein. See also Rogers v. Brown, 416 So.2d 624 (La. App. 2d Cir.1982). "The patient's consent must be an informed one, i.e., the physician has a duty to disclose all known information material to a patient's intelligent decision to undergo a particular operation or therapeutic procedure. That information should include a description and explanation *815 of the proposed diagnostic, therapeutic or surgical procedure contemplated, the material risks involved and any alternatives available." Rogers v. Brown, supra at p. 630 and numerous citations therein.
At the trial, there was some discrepancy between plaintiff and Dr. Belchic as to the extent of the information plaintiff was given in regard to the proposed surgical procedure. Plaintiff claims he received little information about the surgery and specifically was not informed as to the possibility of a non-union. Dr. Belchic testified that he and the plaintiff discussed the surgery in detail and that he gave the plaintiff the usual information given to anyone contemplating a surgical procedure of this type. His testimony is as follows:
... First of all, you're going to be put to sleep and you will not wake up or you may have a problem from anesthesia; you may die for various reasons related to anesthesia. However, the anesthesia will be done under the supervision of the Anesthesia Department of whatever hospital and they are skilled at this. The next thing I say is you may get an infection in the site of surgery. This happens to Mayo Clinic, Oshner's Clinic, everywhere. There is a certain percentage that it will happen in. However, the operation will be done in a hospital and in a operating room under strictly sterile technique. Precautions would be taken, several days antibiotics will be administered, and my experience has been that it has been very low. The third thing I say is that any operation that involves any one of the lower extremities from the toe to the hip, whether it's done following injury electively or as an emergency can cause blood clots to form in the veins in the lower extremity. In fact, probably some do. These blood clots will probably absorb slowly, but there is a possibility that one will form, break loose and become what is known as a pulmonary embolus. If this goes into the lung it can cause shortness of breath, great distress, prolonged stay in the hospital and death. Having covered what I think are the three major things, then I talk about the surgery itself. What I say is this: No matter how well the surgery is done the results may not be satisfactory to you. Maybe you're not happy with the cosmetic appearance, you may not be happy with some other aspect of it, but nevertheless I cannot promise you you'll be completely satisfied with the results. Then I say I'll do my best but if you feel you have to have a guarantee that you're going to be like you were before or like you were when you were eighteen then you need someone else to treat you. Then I do discuss, depending upon the operation, the details. I told him, for example, the scar of the surgery maybe sensitive for a while. However, the incision will be made length wise in the foot which is parallel to the blood vessels, nerves and tendons since they run from the ankle that way. The incision will be placed on top of the foot rather than the bottom so that if it is sensitive you won't be walking on it.
In this case I told him the osteotomy is a surgical fracture, the fracture maybe slow to heal, a certain percentage don't but of those even a smaller percentage are a problem or can be a problem. That's about it. I also try to point out that if there is something you failed to ask me or if there is something I haven't thought to tell you may occur and you may not be satisfied and you need to think about it now. (Emphasis added)
It is well-settled that the verdict of the jury should be affirmed by the appellate court unless the record reflects that the jury's conclusions of fact are not supported by the evidence or the application of law by the jury is clearly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) and Canter v. Koehring Company, 283 So.2d 716 (La.1973). Further "... where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Canter v. Koehring Company, supra. At the trial, *816 the jury had the benefit of personal observation of each witness, hearing their testimony and judging their credibility. The evidence supports the jury's finding that Dr. Belchic orally gave sufficient information to Mr. Doss so as to enable plaintiff to give informed consent to the surgical procedure and he was specifically informed that a risk of the surgery was that the fracture may not heal.
Plaintiff argues that the information regarding the surgical procedure is required to be in a written consent form under La. R.S. 40:1299.40. The written form signed by plaintiff before his surgery was brief and simply stated that plaintiff consented to an osteotomy. No explanation or information as to the procedure was contained in the form. La.R.S. 40:1299.40 provides as follows:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
Sections A and B of the statute were enacted in 1975 and Section C of the statute was added in 1976.
A close reading of Section A, which was in effect at the time of plaintiff's surgery, reveals that consent is not required to be in written form in order to constitute a valid consent. The statute merely defines the requirements of a written consent. It does not state that a patient's consent must be in writing to be effective.
In addressing this issue, the Supreme Court stated that "... the written consent to medical treatment defined in Subsection A of R.S. 40:1299.40 does not purport to be exclusive." LaCaze v. Collier, 434 So.2d 1039 (La.1983) at p. 1046. However, the "... addition of Subsection C the year after the first enactment of the `Uniform Consent' law discloses a legislative intent to define the exclusive methods of obtaining consent to treatment." "Between the limits of Subsection A and Subsection C, all kinds of consents are included." LaCaze v. Collier, supra at p. 1046. Additionally, the Louisiana Medical Consent Law which was enacted in 1975 in conjunction with the Uniform Consent law implicitly recognizes the validity of oral consent. The statute enumerates specific persons who are authorized to consent to medical treatment. In pertinent part, La.R.S. 40:1299.53 states:
*817 In addition to such other persons as may be authorized and empowered, any one of the following persons is authorized and empowered to consent, either orally or otherwise, to any surgical or medical treatment or procedures.... (Emphasis added)
Thus, it is clear that at the time of plaintiff's surgery, consent to an operation was not required to be in written form and oral consent was sufficient.
Even if plaintiff's oral consent had not been valid, the evidence reveals that plaintiff failed to prove a lack of informed consent caused his alleged damages.
The causation test was outlined by the Supreme Court in LaCaze v. Collier, supra, as follows:
Lack of valid consent gives rise to an action for damages. In Louisiana, however, only compensatory damages can be recovered. The defendant can only be cast for those damages caused by the breach of duty. This element, in the jurisprudence, has been referred to as the "causation" element. Not only must the plaintiff show that the undisclosed risk actually occurred, but the plaintiff must also prove that if the risk had been disclosed, the treatment and the unwanted consequences would have been avoided. The plaintiff must prove that the failure to inform caused the damaging consequences. If the plaintiff would have undertaken the treatment in any event, in spite of the deficient "informed consent," there could be no recovery.
Normally the question of causation is one for the trier of fact. In this case, neither the trial court nor the court of appeal reached the causation question since there was no duty found, and consequently, no breach. In determining causation, the finder of fact could consider the condition of the patient at the time of her decision and the necessity for the treatment. Also to be considered are the seriousness of the consequence not disclosed by the physician and the likelihood of the consequence occurring. The finder of fact could likewise consider what measures, if any, would be available for the correction of the consequence if it should occur. (at p. 1048)
From the record, it is apparent that Doss had suffered from the painful callosities for several years before he consulted with Dr. Belchic. He had tried trimming the calluses with a razor blade and had the calluses burned off twice, causing him to miss work, which provided only temporary relief. Doss was seeking permanent relief as his livelihood depended on being able to walk. It is clear that treatment of the painful calluses was necessary in order for plaintiff to fulfill his duties as a mail carrier. The resulting non-union occurs only in ten to fifteen percent of patients undergoing an osteotomy with even a smaller percentage causing subsequent problems in a patient. A corrective measure was available to resolve a non-union and was eventually performed by Dr. W.W. Fox.
Examining these factors, it is the opinion of this court that plaintiff would have undergone the surgical procedure in spite of any deficient consent.
For the foregoing reasons, the judgment of the trial court in favor of defendants, Dr. George Belchic, Jr., and Hartford Fire Insurance Company is affirmed at plaintiff's costs.
AFFIRMED.