528 So.2d 716 (1988)
CAJUN ELECTRIC POWER COOPERATIVE, INC.
v.
OWENS-CORNING FIBERGLASS CORPORATION.
No. 87-CA-815.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 1988.
Writ Denied October 7, 1988.
Frederick R. Bott, New Orleans, for defendant-appellee-cross-appellant.
Don M. Richard, Michael J. Furman, New Orleans, for third-party-plaintiff-appellant.
Before CHEHARDY, BOWES and WICKER, JJ.
WICKER, Judge.
This appeal arises from a suit filed on behalf of Cajun Electric Power Cooperative, Inc. (Cajun) against Owens-Corning Fiberglass Corporation (Owens) for failure to provide Cajun with a properly functioning circulating water pipe at its power plant in New Roads, Louisiana known as Big Cajun Number Two. Owens subsequently settled the Cajun claim. However, Owens also filed a third party claim[1] against Boh Brothers Construction Co., Inc. (Boh). The trial court[2] rendered judgment *717 in favor of Owens in the amount of $239,646.10, which was 10% of the stipulated damages.[3] Owens now appeals and Boh has answered the appeal. We revise and as revised, affirm.
On January 1, 1975 Cajun entered into a contract with the joint venture engineers consisting of Bovay, Burns and Roe. The engineers had the contract to design and manage the construction of Units One and Two for Big Cajun Number Two.
After approval by the Rural Electricification Association a loan was made to finance the project. The plans and specifications prepared by the joint venture engineers were issued for competitive bidding. Boh and Owens were awarded contracts.
Certain provisions of the contract between Owens and Cajun (Contract G-210) dated January 25, 1977 called for Owens to design, furnish, and instruct the installing contractor with regard to the fiberglass reinforced plastic (FRP) pipes for Units One and Two at Big Cajun Number Two. Each unit had two lines of pipe, for a total of four lines referred to as A, B, C and D. A second contract (G-291) was executed between Cajun and Boh on September 26, 1977. Contract G-291 provided to Boh the contract for installation of the pipe.
On or about January 4, 1980 the pipeline was placed into operation. At that time several cracks and leaks were discovered. Cajun and the joint venture engineers decided to repair and strengthen all joints in the existing system. Cajun filed suit against Owens on December 18, 1980 for the cost of the repair. Owens in turn filed third party demands.
Owens now appeals and specifies the following errors:
1. That the trial court erred in finding that Boh, although a solidary co-obligor with Owens for the stipulated damages sustained by Cajun, was liable for only 10% of the damages instead of a 50% virile share, and
2. That the trial court erred in awarding interest from July 11, 1983 instead of from September 4, 1981, the date Owens made judicial demand upon Boh.
Boh has answered the appeal and seeks to have the trial court's judgment reversed or in the alternative to have the judgment revised to reflect that Boh is only liable for five percent of the damages.
MANIFEST ERROR:
The court heard conflicting testimony regarding Boh's alleged negligence. William C. Tolbert (Tolbert), William Todd (Todd) and John S. Wise (Wise) agreed that Boh's performance did not cause the joint failures. Winston Renaud emphasized the problem with the design in the transition area making it difficult for a bond to be achieved despite the care taken by Boh. Conrad Wall (Wall), a pipefitter employed by Boh during the repair, noted that there was a tremendous amount of debonding where the pipe took a 45 degree bend as well as toward the center of each joint from that point. Wise, employed by Bovay as a civil and structural engineer, testified that he observed debonding or failure of the initial layups but attributed the failure to the pipe and not to Boh's work. In particular he noted that the transitions were undersized and as a result there was not much surface area for the layup to adhere to.
Although the pipe thickness was supposed to be ¾ inches thick, some places were as little as 3/8 inches thick. Therefore there was not as much wall area for the layup to adhere to.
Wise believed that the pipe had a design problem. 80% of the joints that debonded were caused as a result of a problem in the transition area. Due to the thinness and the degree of the angle there was difficulty obtaining a bond. Some of the joints in the transition had cracks which went though and though. He was able to place his knife blade in three joints in the transition area.
*718 Other testimony set out the following: David B. Puckett, Sr., (Puckett) testified that he traveled to the job site in the Fall of 1979 as marketing sales manager for pipe. At that time the job was essentially 95% complete.
Around January 4, 1980 he was told that pipelines C and D were leaking. He walked though those lines in January 1980 prior to the repair. He noticed that a few of the layups were not bonded and many showed signs of being unbonded. Approximately 25 to 50% showed either partial bond or no bond at all. He checked randomly for bonding by tapping the area with a metal rod. If a hollow sound was made then the layup was debonded.
Puckett stated that "If a layup is not bonded it won't work and it won't do its function." Kevin Thomas Kerner (Kerner), an Owens employee in the field of civil engineering, stated that the intended use of the circulating water pipes was to circulate water from one point of the system to another without leaking. Although some of the factory-made layups failed as well as the Boh layups, Puckett noted that approximately 30 to 40 or 30 to 45 of the 141 field layup joints made by Boh failed, i.e. 21% to 32%.
Tim Naccarato (Naccarato), a field observer/technician, testified that if the pipe wall surface had not been prepared by sandblasting or grinding prior to making a hand layup there would be no bond. It was "absolutely essential" that the surface be properly prepared prior to making the layup in order to get a bond.
In January, 1980 he had the responsibility of conducting an investigation as to why the debonding occurred. He inspected all four lines.
He saw debonded areas at the transition area and could actually see the separation between the 26 ply layup and the 45 degree bevel at the transition by placing his knife blade in the area. He could see leaks from the crack in the layup.
"Almost all of [the last three ply matt overlay that came out onto the pipe wall] were on unbonded pipe wall." These were placed on smooth pipe wall. He saw loose edges and a leak underneath the three ply matt. He saw no bond and an unprepared surface. Debonding was typical.
Naccarato felt that Boh's work was poor because there was no indication of a sandblasted or prepared surface.
Mark Greenwood (Greenwood), a design engineer for Owens, testified that he designed the Big Cajun # 2 pipe. He initially felt that the joint would be as strong as the pipe. However, his opinion changed. As of the date of trial he did not feel that the joint as designed was as strong as the pipe.
Greenwood inspected the C and D lines in January, 1980. He observed leakage from both field joints as well as factory joints.
He was accepted as an expert in the field of civil engineering and F.R.P. pipe design. He stated that joint problems "resulted from ...two things or a combination of, and that would be either improper workmanship, or loads in excess of those anticipated for this service, or a combination of the two."
Greenwood explained that if a joint failed due to poor workmanship this would be basically due to debonding which would appear as a separation of the layup that was placed in the pipe. With regard to failure due to loading that was unanticipated there would also be a debonding problem close to the transition in some areas. 80% of the joints exhibited problems of a debonding nature.
Frank J. Heger (Heger), an expert in the field of engineering with limited expertise in geotechnics, testified that the joints failed due to unanticipated loads or because they were not properly made so as to achieve bonding, or some combination of these two effects.
Furthermore, the joints were not as strong as the pipe. Heger felt that due to the unstable soil conditions at the site the pipe should have been a flexible system rather than a rigid one as designed.
Billy W. Williams, Owens' Vice-President and General Manager of the Non-Corrosive Products Division in 1980, stated that he attended meetings regarding the *719 repair of the pipe. Owens' assessment of the workmanship at the jobsite led to Owens' lack of confidence in all of the joints.
Wall testified that he worked on 35 to 45 joints. He observed that 95% of these had places that were debonded or loose. Upon removing some of the 26 ply layups in the C and D lines he noticed that the pipe wall appeared smooth rather than being completely "ground or sandblasted." Some areas in the joints had not been sandblasted at all.
Robert E. Sullivan testified that he was employed by Boh during the repair phase. He noticed that some of the 26 ply layups were not bonded at all so that a crack could be seen. Of the 40 joints he worked on he estimated that 95% had no bond.
Kerner testified that he demonstrated to Boh's pipefitters as well as to Bovay personnel how to roll out the layup on the pipe so as to join the sections. He was pleased with Boh's installation of the first two joints. However, there was a difference in the quality of workmanship by Boh as the job progressed. On his visit of October 19, 1978 he found that some of Boh's fabricated joints had unacceptable defects.
As the job progressed he saw more defects which were not addressed by Boh. Boh was capable of making good joints since Kerner found satisfactory joints in November of 1978.
He testified that it was possible to visually detect whether or not the surface of the pipe wall had been properly prepared either by sandblasting or by grinding. If the surface was not prepared properly it would look almost mirror smooth.
Kerner was not on the job site daily; however, he observed that approximately 5 to 10% of the Boh-fabricated joints had visual defects.
After considering extensive testimony the trial court concluded that Owens, as manufacturer of the pipe, had provided a pipeline which had a defective design. He further concluded that the defective design was a major cause of the failure of the pipeline to function for the use for which it was intended, i.e., a non-leaking system.
The trial judge found Boh and Owens to be solidarily liable to Cajun. He explained in his reasons for judgment that:
The Court finds that the evidence shows that Boh Brothers failed in some instances to prepare the services of the pipe properly in order to apply the lay-up joint material which resulted in a failure to bond and contributed to the failure of the joints.

* * * * * *
As a result of the omissions by Boh Brothers the Court finds that the pipeline was installed without strict adherence to the instructions of OCF [Owens] and the contract and said negligence contributed to the failure of the joints at the time of the hydro test.
He assessed Boh's share at 10%.
Although other reasons recited by the trial court as its basis for finding Boh negligent failed to establish a causal connection between Boh's omission and the pipe leakage, nevertheless we find ample support in the record as indicated above to support the trial court's conclusion that Boh was 10% negligent for Boh's failure to adequately prepare the surface of the joint.
The trial judge evidently gave greater weight to the testimony that Boh failed to properly prepare the pipe wall and that this failure resulted in debonding and leaks.
We have followed Louisiana jurisprudence in holding that:
This court, as a reviewing court, must give great weight to the factual findings and conclusions of the trier of fact ... and where there is conflict in the testimony, the reasonable evaluations of credibility and the reasonable inferences of fact reached by a judge or jury shall not be disturbed. This rule must be followed even though the appellate court may feel that its own evaluations and inferences are just as (or more) reasonable. Baach v. Clark, 442 So.2d 514 (La.App. 5th Cir. 1983), Writ Denied 447 So.2d 1067; Doss v. Hartford Fire Ins. Co., 448 So.2d 813 (La.App. 2nd Cir.1984), Writ Denied 450 So.2d 359; Thomas v. Missouri-Pacific R. Co., 451 So.2d 1152 (La.App. 3rd Cir. *720 1984); Canter v. Koehring, 283 So.2d 716 (La.1973).
Jackson v. Hurst, 480 So.2d 487 (La.App. 5th Cir.1985) at 488.
Furthermore,
[a] finding of fact by a trial court should be upheld `unless it is clearly wrong'... `appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court.' [Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978) ]. Proper review requires that the appeal court determine from the record that the trial court finding is not clearly wrong or manifestly erroneous.
Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985) at 972.
In LaFrance v. Abraham Lincoln Mercury, Inc., 462 So.2d 1291 (La.App. 5th Cir.1985) writs denied 467 So.2d 531, 532 (La.1985) the plaintiff sought to rescind a sale of a car for redhibitory defects. Plaintiff sued the seller and the seller in turn filed a third party demand against the manufacturer. In LaFrance we found no abuse of discretion in the trial court's conclusion "[t]hat the redhibitory vice in the vehicle component which led to the rescision was a combination of the defects of the manufacturer ... and by [sic] the improper repairs and service by the dealer... Once the trial court reached this factual conclusion, it could and did hold the dealer and the manufacturer solidarily liable to the purchaser for the purchase price and expenses necessary to restore the purchaser to the position he was in immediately prior to the sale." [Citations omitted; Emphasis supplied] Id. at 1294.
In the instant case the trial court evidently concluded that it was the combination of the defects in the pipe manufactured by Owens and the negligent failure to properly prepare the pipe wall for the layup which caused the leaks in the system. Once the trial court reached this conclusion, then in this case, as in the analogous case of LaFrance, supra the finding that these parties were solidarily liable is not manifestly erroneous.
The conduct of Boh in failing to adequately sandblast the joint was a cause in fact of the lack of bonding resulting in leakage or failure of some joints. In Boh's capacity as the installer of the FRP it owed a duty to Cajun to protect against the risk of debonding causing leakage. The risk of the pipe leaking was foreseeable from Boh's conduct. It was reasonable that failure to sandblast would result in debonding and ultimate joint failure. There is sufficient ease of association to hold Boh negligent under a duty-risk analysis. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (La.1972); Dixie Drive it Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (La.1962).
CONTRIBUTION:
L.S.A.-C.C. Art. 2103[4] (As amended by Acts 1960, No. 30, Section 1, effective January 1, 1961) provided that:
When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi contract, an offense, or a quasi offense, it should be divided between them. As between the solidary debtors, each is liable only for his virile portion of the obligation.
A defendant who is sued on an obligation which, if it exists, is solidary may seek to enforce contribution, if he is cast, against his solidary co-debtor by making him a third party defendant in the suit, as provided in Article [Articles] 1111 through 1116 of the Code of Civil Procedure, whether or not the third party defendant was sued by the plaintiff initially, and whether the defendant was sued by the plaintiff initially, and whether the defendant seeking to enforce contribution if he is cast admits or denies liability on the obligation sued on by the plaintiff.
L.S.A.-C.C. Art. 2103 was amended by Acts 1979, No. 431, Section 1, effective August 1, 1980 to read:
When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi-contract, an offense, *721 or a quasi-offense, the debt shall be divided between them. If the obligation arises from a contract or a quasi-contract, each debtor is liable for his virile portion. If the obligation arises from an offense or a quasi-offense, it shall be divided in proportion to each debtor's fault.

A defendant who is sued on an obligation which, if it exists, is solidary may seek to enforce contribution, if he is cast, against his solidary co-debtor by making him a third party defendant in the suit, as provided in Article 1111 through 1116 of the Code of Civil Procedure, whether or not the third party defendant was sued by the plaintiff initially, and whether the defendant seeking to enforce contribution if he is cast admits or denies liability on the obligation sued on by the plaintiff. [emphasis added]
In Rowell v. Carter Mobile Homes, Inc., 482 So.2d 640 (La.App. 1st Cir.1984) affirmed 500 So.2d 748 (La.1987), the first circuit noted that:
[1] a. Civ.Code art. 2103, as amended by Act 431 of 1979, effective August 1, 1980, and in effect at the time of plaintiff's injury, provided a solidary obligation resulting from an offense or a quasi-offense shall be divided in proportion to each debtor's fault [footnote omitted; emphasis in original] 482 So.2d 640 at 647-48.
The Rowell court however did not have to consider the issue of whether the date of the plaintiff's injury was also the triggering date for the third party demand since both the plaintiff's suit and the third party suit were filed after the effective date of article 2103.
Act No. 431 of 1979 was enacted in order to:
amend and reenact Articles 2103, 2323 and 2324 of the Louisiana Civil Code, and Articles 1811 and 1917 of the Code of Civil Procedure, relative to liability for an obligation arising from an offense or quasi-offense, to provide for proportionate sharing of liability between or among joint tort feasors, to provide for the computation of damages when contributory negligence is applicable, to provide for liability of persons whose concurring fault has caused injury, death or loss to another, to provide for the use of special verdicts in jury trials and to require special written findings of fact and reasons in judge trials of damage actions, and otherwise to provide with respect thereto. [emphasis added]
In LaFrance, supra we noted in footnote 1 at 1295 that "The amendment of Article 2103 which allows apportionment of damages amongst solidary obligors became effective August 1, 1980." Id. at 1295.
However, the issue of whether the filing of a third party demand after the effective date of August 1, 1980 meant that the new 2103 article applied was not an issue before the LaFrance court as it is in the case at bar.
In 12 F. STONE, LOUISIANA CIVIL LAW TREATISE (TORT DOCTRINE), Section 111 (1977) "virile share" is defined as:
Louisiana jurisprudence speaks of each joint tort feasor contributing his virile share. Earlier editions of H. and L. Mazeaud's Traite' Théorique et Pratique de la Responsabilite' civil délictuelle et contractuelle spoke of the division into virile parts: into halves, if there were two faults producing the damage; into thirds if there were three faults etc. However, a later edition criticizes this solution on the ground that it does not take into account the causal relation of the various faults to the damage, which fact should determine the participation of each of the defendants in the preparation. But the Cour de Cassation has decided that the participation is determined not by causal relation (pouvoir) of the faults but by their gravity [footnotes omitted; emphasis in original].
"Under the earlier rule [L.S.A.-C.C. Art. 2103 prior to August 1, 1980], joint tortfeasors were each liable for their virile, that is per capita, share of the debt[.]" Diggs v. Hood, 772 F.2d 190, 194 (5th Cir. 1985). See also Harvey v. Travelers Insurance Co., 163 So.2d 915 (La.App. 3rd Cir.1964).
*722 In construing former article 2103 which stated that the solidary obligors were each liable for his virile portion, the Louisiana Supreme Court held that:
[i]f the joint tortfeasor requesting contribution proves that a tort was in fact committed, that the defendant was solidarily liable with him for the amount compromised, and that the amount paid was not in excess of the damage inflicted, he may collect his pro rata share from the other joint tortfeasor by virtue of a separate suit [footnote omitted; emphasis supplied; quoting the findings of the appellate court at 206 So.2d 155 at 158].
Morris v. Kospelich, 253 La. 413, 218 So.2d 316, 317 (La.1969).
Contribution has been defined by the Louisiana Supreme Court as that which "[a]pportions the loss among joint tortfeasors and requires each to pay his virile share of the damages that result from the wrong. La.Civil Code arts. 2130,[5] 2104,[6] 2161,[7] 2324[8] (1870) [footnotes added]." Green v. Taca International Airlines, 304 So.2d 357, 359 (La.1974). In addition, "[j]oint tort feasors are liable in solido for the damages caused by them. LSA-CC. Art. 2324;[9]Smith v. Southern Farm Bureau Casualty Ins. Co., 247 La. 695, 174 So.2d 122 [1965]; Cust v. Item Co., 200 La. 515, 8 So.2d 361 [1942]; Reid v. Lowden, 192 La. 811, 189 So. 286 [1939] [footnote added]." Shaw v. New York Fire & Marine Underwriters, Inc., 252 La. 653, 212 So.2d 416, 418 (La.1968). See also Marzula v. White, 488 So.2d 1092 (La.App. 2nd Cir.1986); Hatcher v. State, Dept. of Transp. & Dev., 478 So.2d 774 (La.App. 3rd Cir.1985), writ denied 479 So.2d 923 (La. 1985).
In Brown v. New Amsterdam Casualty Company, 243 La. 271, 142 So.2d 796 (1962) the Louisiana Supreme Court considered a similar issue to the case at bar when it determined the effective date of a change in the law relative to a contribution claim on the part of a joint tortfeasor. "[P]rior to the 1960 amendment to Article 2103 an alleged tort feasor could not enforce contribution from a person whom he asserted to be a joint wrongdoer unless and until both had been cast in solido by a judgment secured by the injured party." Id. 142 So.2d at 797-98.
In Brown, supra the third party petitions had been dismissed by the trial court following exceptions of no right and or no cause of action. The basis for the dismissal was that although plaintiffs' petition as well as the third party petitions were filed after the effective date of the new legislation, the third party demands were based on a tort which occurred prior to the effective date of article 2103. Under the old law the third party plaintiffs could not have pursued their contribution claim.
The Brown court however distinguished the contribution claim from the tort claim *723 and reversed the trial court's dismissal of the third party petitions. It reasoned as follows:
It is true that as of that time the injured party's right and cause of action against either or both of two joint tort feasors come into being; and conversely, the obligation of each of the latter to the claimant also commences. On the other hand, the rights and obligations as between the joint wrongdoers do not then arise, because they are not created by virtue of the commission of the tort and of the provisions of Revised Civil Code Article 2315. Rather, they spring from the principle of contribution, enunciated in Article 2103 and our jurisprudence, which is required of solidary obligors when one has been compelled to pay the full amount of the obligation. See Sincer v. Bell, 47 La.Ann. 1548, 18 So. 755 and Quatray v. Wicker et al., 178 La. 289, 151 So. 208. And it is only after judicial demand has been made on one of two or more solidarily obligated tort feasors that he can have any possible interest in seeking contribution. [emphasis added]
Therefore, herein, when the 1960 amendment to Revised Civil Code Article 2103 became effective on January 1, 1961 there were no rights or obligations in esse as between [defendant and third party plaintiffs] Manning and New Amsterdam, on the one hand, and the third party action defendant, Hartford (the instant suits were not filed until after that date); and, as a consequence, those codal provisions could not possibly have affected any pre-existing substantive rights as between such parties. From which it follows that it is immaterial whether the relief afforded by the 1960 amendment is substantive or procedureal.
142 So.2d 796 at 798.
In the instant case both the plaintiff's demand and the third party demand were filed after the effective date of new L.S.A.-C.C. Art. 2103. Since the cause of action in contribution arose on December 18, 1980 when judicial demand was made by Cajun on one of the alleged tortfeasors, the August 1, 1980 codal provisions apply and Boh's alleged share must be apportioned on the basis of fault rather than on a virile pro rata basis. Brown, supra.
We further note that Section 4 of Act No. 431 of 1979 provides that "The provisions of this act shall not apply to claims arising from events that occurred prior to the time this act becomes effective." According to Brown, supra the event which triggers the third party claim in contribution is judicial demand against an alleged tortfeasor. Since that event occurred after August 1, 1980 the amendment applies. See also Ducre v. Executive Officers of Halter Marine, Inc., 752 F.2d 976, 987-89 (5th Cir.1985); Martin v. American Petrofina, Inc., 785 F.2d 543, 544 (5th Cir.1986). Accordingly, the trial court did not err when he apportioned damages based on "fault" rather than "virile share".
INTEREST:
Appellant further contends that the trial court erred in awarding interest from the date upon which the damages were stipulated rather than on the date of its judicial demand. We agree.
Owens' third party demand in addition to a negligence claim also alleged that the third party defendants had breached contracts with Cajun of which Owens is the third party beneficiary. However on May 18, 1983 the trial court granted motions for partial summary judgment filed on behalf of Boh, Bovay and Burns and Roe dismissing any claims by Owens with regard to Owens' allegation that it was a third party beneficiary or that it benefited pursuant to a stipulation pour autri. Thus, the only remaining third party claim asserted by owens in the trial court below sounds in negligence.
When Owens' counsel stipulated at trial to the amount of damages sustained by Cajun[10] he stated "This is reserving to ourselves the right to bring a contract cause of action subsequently." Furthermore, Owens' counsel had previously suggested to the court that as an assignee of Cajun's rights pursuant to the settlement, he would "probably ... file our next lawsuit *724 in Federal Court on the basis of diversity on the contract causes of action." Any alleged assignment of contractual rights to Owens by Cajun by virtue of the settlement is not before this court. Therefore, the only claim remaining at trial was Owens' third party claim in negligence. Accordingly interest runs from the date of judicial demand. See L.S.A.-C.C. Art. 2924; Breaux v. Roy Young, Inc., 397 So. 2d 1384 (La.App. 3rd Cir.1981); Lanclos v. Rockwell Intern. Corp., 470 So.2d 924 (La. App. 3rd Cir.1985) writ denied 477 So.2d 87 (La.1985); Doran v. Chisholm, 501 So.2d 914 (La.App. 5th Cir.1987).
For the reasons stated, the judgment is revised and as revised, it is affirmed to now read:
IT IS ORDERED, ADJUDGED AND DECREED that the prior judgment is modified in the following respect: That there be judgment herein in favor of third party plaintiff, Owens Corning Fiberglass Corp., and against Boh Brothers Construction in the full amount of TWO-HUNDRED THIRTY-NINE THOUSAND SIX HUNDRED FORTY-SIX AND 10/100 (DOLLARS) with judicial interest from September 4, 1981, the date of judicial demand.
REVISED AND AS REVISED, AFFIRMED.
NOTES
[1] Following trial on the merits, the trial judge rendered judgment on July 19, 1984 in favor of Bovay Engineers, Inc. (Bovay) and Burns and Roe, Inc., dismissing Owens third party demands against these parties pursuant to L.S.A.-C.C.P. Art. 1672(B). Boh's motion for involuntary dismissal, however, was denied.
[2] Trial was held over a period of ten months from July, 1983 to May, 1984 for a total of 19 days.
[3] On November 4, 1986 the trial court rendered judgment in favor of Owens against Boh for contribution of 10% in the amount of $286,012.00. After considering a timely motion for new trial the trial judge rendered an amended judgment in the corrected amount of $239,646.10, which was 10% of the stipulated damages of $2,396,461.03.
[4] L.S.A.-C.C. Art. 2103 was vacated by Acts 1984, No. 331, effective January 1, 1985. The subject matter of former art. 2103 is now contained in L.S.A.-C.C. Arts. 1804 and 1805.
[5] See supra note 1.
[6] The substance of former article 2104 is now contained in L.S.A.-C.C. Arts. 1804 and 1806 (post 1985 amendment by Acts 1984, No. 331, Section 1, effective January 1, 1985).
[7] The substance of former article 2161 has been changed in part and now contained in L.S.A.-C.C. Art. 1829 (post 1985 amendment by Acts 1984, No. 331, Section 1, effective January 1, 1985).
[8] Former article 2324 was amended along with former article 2103 by Acts 1979, No. 431, Section 1, effective August 1, 1980. Prior to August 1, 1980 article 2324 read:

He who causes another person to do an unlawful act, or assists of encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
The article now reads:
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
[9] Id.
[10] See infra note 3.