LINDSAY, Judge.
The plaintiff, Alvin B. Coleman, appealed from a judgment rejecting his claims against Louisiana Power and Light Company (hereinafter referred to as “LP & L”). The plaintiff sought damages for the injuries he sustained when the crane upon which he was leaning became electrified by contact with the defendant’s electric utility lines. The jury found the defendant free of fault. For the following reasons, we affirm the judgment of the trial court.
FACTS
In May of 1983, a severe storm caused substantial damage in Caldwell Parish and the surrounding area. Of 800 miles of electrical line, about 600 miles were knocked down. At one point, all 11,000 of LP & L’s customers were without electricity. Approximately 700 new poles had to be installed in order to restore electrical service to the community. LP & L had insufficient personnel to repair the enormous *956 amount of damage, and about 260 to 270 workers were called in from other areas to assist in the restoration of power in the storm-damaged locality.
An electrical power pole on Louisiana Highway 849 was one of the numerous poles knocked down by the storm. The pole was originally located about forty-one feet from the center line of the highway. Due to standing water and debris, the LP & L workers were unable to place the new pole (hereinafter referred to as the “temporary pole”) in the same spot as the original pole. The temporary pole was placed about twenty-four feet from the center line of the highway, or seventeen feet closer to the road than the original pole. It was located approximately thirteen to fourteen feet from the edge of the two-lane rural road. Its placement put the pole out of line with the other poles running along this stretch of road.
In its new position, the temporary pole was located off of LP & L’s right-of-way and on the state’s highway right-of-way. No permit was obtained to place the temporary pole on the state’s highway right-of-way.
In September, 1983, the Department of Transportation and Development rebuilt a bridge on Louisiana Highway 849 in the vicinity of the temporary pole. The plaintiff, a highway department employee who generally worked with a dirt crew as a heavy equipment operator, was temporarily assigned to the bridge reconstruction crew. His job on this project was to operate a combination backhoe-loader to “dig out headwalls”.
On September 26, 1983, the work on the bridge was completed, and the two-lane road leading to it was scheduled to be reopened that afternoon. The crew was in the process of moving timber which was lying on the road right-of-way. To facilitate this work, the crew utilized a motor crane mounted on a truck. This truck-mounted crane was on the roadway. The crane’s boom was sixty feet long. Forrest Moore, the foreman of the road reconstruction crew, testified that all the debris which was moved was picked up and swung away from the power lines.
The plaintiff’s backhoe had broken down and was awaiting repair. After spending the morning sitting idly in his truck, the plaintiff decided to assist his fellow workers with the clearing of debris. The plaintiff began unhooking the crane cable from the debris and pieces of timber after their removal from a cleared area. At one point, he was relieved by another worker and went back up the incline to get a drink of water. Apparently, while resting, he leaned on the front bumper of the truck upon which the crane was mounted.
At about the same time, the hook of the crane cable became entangled in some vines, creating tension on the cable and boom. When the cable came loose, it swung all the way across the road. It then came into contact with the uninsulated highline of the temporary pole which was on the opposite side of the road. Witnesses reported seeing a small blue “arc” as contact was made. An electrical charge surged through the cable into the boom, the truck and then through the plaintiff’s body. The plaintiff suffered severe burns on his arm and on the soles of both of his feet.
Subsequently, the plaintiff filed suit against LP & L, claiming its negligent placement of the temporary pole created a hazard to routine highway maintenance operations and thus caused his injuries. The defendant answered, claiming comparative negligence on the part of the plaintiff, who put himself in contact with the vehicle while the crane was operational.
A petition of intervention was filed by the plaintiff’s employer to recover the worker’s compensation benefits and medical expenses it had expended as a result of the plaintiff’s injuries.
A jury trial on the merits began on January 29, 1986. At the conclusion of the trial on February 4, 1986, the jury returned a verdict finding the defendant free of negligence. A judgment reflecting the verdict was signed on March 10, 1986.
On March 19, 1986, the plaintiff filed a motion for judgment notwithstanding the *957 verdict, or, in the alternative, for a new trial. By written reasons dated January 30, 1987, the trial court denied the motion. A judgment in conformity with the ruling was signed February 19, 1987.
The plaintiff filed a devolutive appeal. The plaintiff argues that the jury verdict was clearly erroneous in finding LP & L free from negligence in connection with the plaintiffs accident and resulting injuries. The plaintiff further argues the extent of his injuries, and the issue of his alleged comparative negligence. Because we find the first issue concerning LP & L’s liability to be dispositive of this case, we do not consider these additional issues.
LIABILITY OF LP & L
The plaintiff argues that the jury was clearly wrong in its determination that LP & L was not negligent. He contends that LP & L was negligent in leaving the temporary pole on the highway right-of-way for several months after the storm. The plaintiff further argues that the placement of the temporary pole constituted a hazard, and that it was foreseeable that someone would have to remove the fallen timber in the area.
The plaintiff presented the testimony of several witnesses to the accident who stated that the hook on the end of the cable, or the cable near the hook, struck the highline near the temporary pole. However, none of these witnesses (Forrest Moore, Cecil Chaudoin, and Huey Little) testified as to the angle of the boom, or the length of the cable at the time of the accident. Additionally, no evidence was presented as to the force with which the cable struck the utility wires.
The plaintiff and LP & L each presented the testimony of an expert in electrical engineering. Both experts agree that the temporary pole greatly exceeded the minimum requirements specified in the National Electric Safety Code (NESC). The NESC required that the pole be installed at least six inches from the pavement and the wires be at least 18 to 20 feet high. The temporary pole was approximately 13 feet away from the edge of the road and its highline was about 31 feet high.
Ricky Louis Nowlin, the plaintiff’s expert, testified that the location of the temporary pole created a hazard and compromised the NESC requirements. He stated that the temporary pole was left too close to the road for too long a period of time following the emergency caused by the storm. However, he agreed that installations should be undertaken in accordance with good, safe engineering practices under the existing local conditions. He conceded that he did not know what the existing local conditions were, relative to the storm damage, at the time of the installation. Nor did he know the number of poles that went down as a result of the storm.
In arriving at his opinions and conclusions, Mr. Nowlin never looked at the crane involved in the plaintiff’s accident. He had no knowledge of the size of the boom or the length of the cable. In fact, he conceded he did not know whether contact would have been made between the cable and the temporary pole if it had been installed in the same position as the original pole. Mr. Nowlin also admitted that it is common practice for utility companies to make installations on the state’s right-of-way, and that permits from the state are not always obtained.
LP & L’s expert witness, Fredrick Michael Brooks, testified that the temporary pole was not a hazard. It far exceeded any NESC requirements. While he stated that it was foreseeable that some sort of power equipment might be used to clear debris in the area, he stated that it was not foreseeable that such an enormous crane with a 60-foot boom would be utilized.
Testimony was also given by several of LP & L’s executive officers, including Alton Calhoun, its land superintendent in charge of the right-of-way for the Northern Division. He testified that there was no procedure for obtaining permits from the state to place poles on the state’s right-of-way in the course of emergency restoration of power. As a public utility, LP & L’s overriding consideration would be to restore electrical service to its customers as *958 quickly as possible. Mr. Calhoun further testified that after an emergency, it was LP & L’s practice to go back and restore poles to their original positions within a reasonable period of time. However, he testified that the May, 1983 storm was an emergency of unusual magnitude which left an enormous amount of debris. In fact, restoration work, which involved removal of debris and moving of poles, continued for two years after the storm.
Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as practical. If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to insulate them in some manner (including insulation by isolation), or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury. However, an electric utility is not required to guard against situations which cannot reasonably be expected or contemplated. Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265 (La.1980); Hebert v. Gulf States Utilities Company, 426 So.2d 111 (La.1983).
Critical to the issue of liability is whether, under the circumstances of this particular case, the defendant should have foreseen the likelihood of the accident which occurred. Price v. Mitchell Construction Company, Inc., 482 So.2d 869 (La.App.2d Cir.1986), writ denied 484 So.2d 671 (La.1986).
Where there is evidence before a jury which, upon its reasonable evaluation of credibility, furnishes' a reasonable basis for its factual findings, on review the findings should not be disturbed by the appellate court in the absence of manifest error. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978); Doss v. Hartford Fire Insurance Company, 448 So.2d 813 (La.App.2d Cir.1984), writ denied 450 So.2d 359 (La. 1984); Allen v. Burrow, 505 So.2d 880 (La.App.2d Cir.1987), writ denied 507 So.2d 229 (La.1987).
After careful examination of the record before us, we conclude that there is ample evidence to support the jury verdict. There is always the possibility that, under some extreme and remote circumstances, an object might become entangled in electric wires that are normally high enough to be insulated by isolation. However, we find that this utility pole and electric line on a remote, rural road was adequately insulated from highway activity to preclude it from being construed as creating an unreasonable risk of harm. Given the length of the boom and the attached cable, this accident could have easily occurred even if the temporary pole had been located on the LP & L right-of-way in the same spot as the original pole. (The plaintiffs own expert witness could not discount such an occurrence.)
We find that there was substantial evidence in the record to support the jury’s findings that LP & L was not negligent. There was no ease of association between the risk presented by the placement of the pole under the overall circumstances and the plaintiff’s resulting injuries. As in Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982), a combination of unusual factors combined to cause the accident.[1] Under the overall circumstances of this case, we cannot, fault the defendant’s conduct. The storm which occurred in May of 1983 caused considerable damage, which took LP & L about two years to fully repair. The pole in question exceeded NESC requirements by a wide margin.
*959 The occurrence of an unusual accident such as the one in which the plaintiff was injured was not reasonably foreseeable.
CONCLUSION
Therefore, we affirm the judgment of the trial court at the plaintiff’s cost.
AFFIRMED.

. In Kent, the plaintiff was electrocuted while working on a highway project to widen a stretch of road. The plaintiff was using a rake to make antihydroplaning grooves across a double width of roadway. The handle of the rake came into contact with overhead electrical wires. The grooving machine usually used for such a job had broken down the morning of the accident. A bench which straddled the concrete slab and allowed the plaintiff to transfer the rake from one side of the poured concrete to the other with greater ease was appropriated by other workers. Thus, the plaintiff utilized a "flip-flop” method of moving the rake. These factors combined together with the unusual length of the rake handle to cause the accident in which Kent was injured.